UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**A&W X-PRESS, INC.**,
a Michigan corporation,

      Plaintiff,

Case No.

Hon.

vs.

**FCA US, LLC,**
a foreign limited liability company,

      Defendant.

---

Ryan Lee Perry (P55545)
Geoffrey S. Wagner (P70839)
GIARMARCO, MULLINS & HORTON, P.C.
Attorneys for Plaintiff
Tenth Floor Columbia Center
101 W. Big Beaver Rd.
Troy, MI 48084-5280
(248) 457-7000
rperry@gmhlaw.com
gwagner@gmhlaw.com

---

## COMPLAINT FOR SPECIFIC PERFORMANCE AND DECLARATORY RELIEF

---

Plaintiff, A&W X-Press, Inc., by and through its counsel, Giarmarco, Mullins & Horton, P.C., states the following in support of its Complaint:

## THE PARTIES, JURISDICTION & VENUE

1.    This is a Complaint for specific performance and declaratory relief.

2.    Plaintiff, A&W-Xpress, Inc. ("A&W"), is a Michigan Corporation with its principal place of business in the City of Warren, Michigan.

3.    Defendant, FCA US, LLC ("FCA"), is a foreign limited liability company organized under Delaware law.

4.    Under federal law, the citizenship of an LLC is determined by the citizenship of its various members.

5.    In the instant case:

   a.    FCA's lone member, FCA North America Holdings, LLC, is a citizen of the State of New York; and

   b.    FCA North America Holdings, LLC's lone member, Fiat Chrysler N.V., is a publicly-traded company formed in the Netherlands, with its principal place of business in London, England.

6.    FCA conducts substantial business in the State of Michigan.

7.    This Court has diversity jurisdiction pursuant to 28 U.S.C. Sec. 1332 because:

   a.    The amount in controversy is in excess of $75,000.00, exclusive of costs, interest and attorney's fees;

–2–

b. The Plaintiff is a citizen of the State of Michigan; and

c. The Defendant is a citizen of Delaware; New York; the Netherlands; and the United Kingdom.

8. This Court has jurisdiction to and issue a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. Sec. 2201, *et seq.,* because an actual controversy exists between the parties with respect to their rights in real property, and A&W's Lease with FCA regarding same.

9. Venue is proper in this Court because all of Plaintiff's claims relate to the Subject Property, which is located in the County of Macomb, State of Michigan.

## **GENERAL ALLEGATIONS**

10. Plaintiff restates all prior allegations as if fully set forth herein.

11. At all relevant times, A&W leased a 23,350 square foot facility located at 22077 Mound Rd., Warren, MI and the real property associated with it (the "Subject Property"), from FCA.

12. A&W has approx. 85 employees/contractors and, at any given time, has 100 to 120 trucks and over 135 trailers on site at the Subject Property.

13. A&W uses its large fleet of vehicles to deliver supplies including fresh produce, auto parts and medical supplies to 700+ customers throughout the United States and Canada. Its operations are open 365 days a year and 24 hours a day.

14. For ease of reference, an aerial photograph of the Subject Property is provided

below:



15.   There are only a handful of locations throughout the State of Michigan (e.g., the

Subject Property) that: (a) are located near major thoroughfares; and (b) can

accommodate a trucking business of this size/volume.

16.    The central issues in this case are: (a) whether the parties' Lease Agreement has been extended for another 5-year term (i.e., through 9/30/26); and (b) what the "fair market [rental] rate" for the Subject Property is.

17.    If FCA is permitted to move forward with its threatened unlawful eviction, A&W will be put out of business.

## A. **BACKGROUND**

18.    A&W is a trucking/transportation company; it has, for ten years, used the Subject Property to operate its business.

19.    On July 1, 2011, A&W entered into a Lease Agreement ("Lease") regarding the Subject Property with Dunn & Mavis, Inc. (*See* **Exhibit A**).

20.    The Lease's initial term ran from September 1, 2011 through August 31, 2016. (*Id.* at ¶ 3).

21.    The Lease also provides A&W with a contractual right to renew its tenancy for two additional 5-year terms. (*Id.* at ¶ 39).

22.    The monthly rent during the *first* renewal period increased from $9,500 to $9,750, whereas rent during the *second* renewal period is to be paid at "a fair market rate." (*Id.*).

23.    On or about July 1, 2016, A&W exercised its first renewal option; in turn, the Lease was extended through September 30, 2021.

## B. **FCA PURCHASES THE SUBJECT PROPERTY**

24. On or about December 2, 2019, FCA purchased the Subject Property from Dunn & Mavis, Inc. (*See* **Exhibit B**, Notice to Tenant).

25. As noted in the pertinent Estoppel Certificate, when FCA purchased the Subject Property, it was aware of the fact that A&W had the right to extend the Lease for another term. (*See* **Exhibit C**, Estoppel Certificate, ¶¶ 7, 11) (noting additional 5-year option commencing 9/30/21 and ending 9/30/26).

26. The change in ownership was uneventful, and A&W continued to operate its trucking business without incident during the year 2020.

## C. **THE SECOND RENEWAL OPTION**

27. On or about January 1, 2021, the parties began to discuss A&W's second renewal option. (*See* **Exhibit A**, 2011 Lease, ¶ 39).

28. On April 21, 2021, FCA's Real Estate Director, Ed O'Neil, sent an email to A&W's principal, Ray Mosawi. (*See* **Exhibit D**, 4/24/21 Email from E. O'Neil to R. Mosawi). Notably, the email confirms the fact that:

   a. The parties agreed to extend the Lease for another 5-year term; and

   b. The only unresolved issue was the "fair market rate" for the second renewal period. (*Id.*).

29. On May 21, 2021, A&W's corporate counsel, George Contis, Esq., sent an email to Mr. O'Neil (*See* **Exhibit E**, 5/21/21 Email from G. Contis to E. O'Neil). In

his email, Attorney Contis:

    a.  Confirmed the parties' agreement to extend the Lease for another term; and

    b.  Proposed a comprehensive appraisal process to determine the "fair market rate." (*Id.*).

30.    On May 27, 2021, FCA's Real Estate Counsel, Sara Von Bernthal, sent an email to George Contis. (*See* **Exhibit F**, 5/27/21 Email from S. Von Bernthal to G. Contis). In her email, Attorney Von Bernthal:

    a.  Confirmed the parties' agreement to extend the Lease for another term; and

    b.  Raised several questions regarding the appraisal process suggested by Attorney Contis. (*Id.*).

31.    On May 27, 2021, Attorney Contis responded to Attorney Von Bernthal's email. (*See* **Exhibit G**, 5/27/21 Email from G. Contis to S. Von Bernthal). In his email, Attorney Contis:

    a.  Agreed with Von Bernthal that the Lease is silent with respect to the process for determining the "fair market rate"; and

    b.  Disagreed with Von Bernthal that FCA has the right to "unilaterally establish [the] fair market rate." (*Id.*).

32.    On June 10, 2021, Attorney Contis sent another email to Attorney Von Bernthal.

(*See* **Exhibit H**, 6/10/21 Email from G. Contis to S. Von Bernthal). In his email, Attorney Contis:

    a. Reiterated A&W's position that FCA does not have the "unilateral ability to establish the fair market rental rate"; and

    b. Emphasized the fact that A&W remained "ready to negotiate a market lease rental rate in good faith," via the aforementioned appraisal process. (*Id.*).

33. On June 21, 2021, Attorney Von Bernthal sent an email to Attorney Contis. (*See* **Exhibit I**, 6/21/21 Email from S. Von Bernthal to G. Contis). In her email Attorney Von Bernthal stated that FCA would be sending its own "proposed appraisal process to determine fair market value tomorrow." (*Id.*).

34. On June 24, 2021, FCA's Treasury Director, Gretchen Sonego sent a Letter to A&W's President, Ray Mosawi. (*See* **Exhibit J**, 6/24/21 Letter from G. Sonego to R. Mosawi). In her Letter, Director Sonego:

    a. Responded to several of the issues raised previously by Attorney Contis; and

    b. Proposed a modified "Appraisal Mechanism" to resolve the fair market rate issue. (*Id.*).

35. On June 24, 2021, Attorney Contis responded to Director Sonego's Letter. (*See* **Exhibit K**, 6/24/21 Letter from G. Contis to G. Sonego). In his Letter, Attorney

Contis:

    a. Confirmed the parties' agreement to establish a "mutually agreeable appraisal process" to determine the "fair market rate"; and

    b. Provided detailed redline-edits to FCA's "Appraisal Mechanism." (*Id.*).

### D. FCA'S SHAMEFUL ABOUT-FACE

36. On July 20, 2021, FCA's outside counsel, Monica Labe, Esq., sent a letter to A&W. (*See* **Exhibit L,** 7/20/21 Letter from M. Labe to R. Mosawi). In a drastic departure from what had, to that date, been a lengthy and good faith negotiation over the "fair market value," Attorney Gabe:

    a. Alleged that, notwithstanding the past six months of negotiations/emails/etc., the parties' Lease was "null and void" because the second option had, allegedly, not been properly renewed under ¶ 39;[1]

    b. Instructed A&W to "surrender the Premises" no later than September 30, 2021. (*Id.*).

37. On July 20, 2021, Attorney Contis sent an email to Attorney Labe. (*See* **Exhibit M**, 7/20/21 Email from G. Contis to M. Labe). In his email, a nonplussed Contis accused FCA of "fail[ing] to act in good faith." (*Id.*).

38. On July 26, 2021, Attorney Contis followed up on his email to Attorney Labe

---

[1] This Paragraph states, in pertinent part, that: "Should Tenant elect to exercise its Option, Tenant shall provide Landlord with ninety (90) days advance written notice, return receipt requested." (*Id.*).

with a formal Letter. (*See* **Exhibit N**, 7/26/21 Letter from G. Contis to M. Labe). In his Letter, Attorney Contis:

    a. Informed Labe that the renewal option had been: (i) exercised by A&W; <u>and</u> (ii) confirmed by a number FCA employees/agents (e.g., O'Neil, Von Bernthal, etc.) on *multiple* occasions; and

    b. Raised the prospect of litigation if FCA continued to engage in bad faith negotiations relative to the second renewal term.

39.    On August 3, 2021, Attorney Labe responded to Attorney Contis' letter. (*See* **Exhibit O**, 8/03/21 Letter from M. Labe to G. Contis). In her letter, Labe reiterated FCA's position that the second renewal option had, allegedly, not been properly renewed under ¶ 39 of the Lease. (*Id.*).

40.    With the parties now at an impasse, A&W brings this action to:

    a. Compel specific performance of the Lease's second renewal option.

    b. Obtain a declaratory judgment that:

        i. FCA waived the right to assert ¶ 39 and/or the statute of frauds as defense(s) in this lawsuit;

        ii. FCA's ¶ 39 and/or statute of frauds defense(s) is barred by the doctrine of equitable estoppel;

        iii. FCA's statute of limitations defense is barred by the doctrine of partial performance; and

      iv. Determining the current "fair market rate" for the Subject

Property.

## COUNT I
## SPECIFIC PERFORMANCE

41. Plaintiffs restate all prior allegations as if fully set forth herein.

42. On or about July 1, 2011, the parties entered into a valid Lease.

43. On or about July 1, 2016, the Lease was extended through September 30, 2021.

44. In April, May and June of 2021, the parties agreed to:

    a. Extend the Lease through September 30, 2026; and

    b. Determine the "fair market rate" for the second renewal term by way of a

       formal appraisal process.

45. On July 20, 2021, FCA reneged on the parties' renewal agreement and, thereafter,

took the position that the Lease was "null and void" because the second option

had, allegedly, not been properly renewed under ¶ 39.

46. Under Michigan law, specific performance of an agreement is an appropriate

remedy where enforcement of a given promise is necessary to avoid injustice.

*Thermatool Corp v. Borzym*, 227 Mich. App. 366, 375; 575 NW2d 334 (1998).

47. Here, specific performance of the second renewal option is necessary to avoid

an injustice for the reasons set forth *supra* in this Complaint.

**WHEREFORE**, this Court should enter an Order that: (1) compels specific

performance of the second renewal option; (2) extends the Lease through September

30, 2026; and (3) grants any other relief deemed fair and equitable under the circumstances of this case.

**COUNT II**
**DECLARATORY JUDGMENT (WAIVER)**

48.    Plaintiff restates all prior allegations as if fully set forth herein.

49.    Under Michigan law, waiver is defined as the intentional relinquishment of a known right. *Angott v. Chub Group Ins. Co.,* 270 Mich. App. 465, 469-70; 717 N.W.2d 341 (2006).

50.    In attempting to establish a waiver, a party may rely on express agreement(s) or, alternatively, inferences drawn from declarations/acts/conduct/etc. *Id.*; *See also* 32 A.L.R. 4th 452, WAIVER OR ESTOPPEL AS TO NOTICE REQUIREMENT FOR EXERCISING OPTION TO RENEW OR EXTEND LEASE, § 12 (Westlaw, 2021) (citing cases and explaining that, in cases involving leases of real property with options to renew or extend, "lessors had waived, or been estopped from asserting, their rights to notice where they had joined in the appointment of arbitrators for the purpose of fixing rent applicable to the additional terms").

51.    Here, FCA waived its right to assert ¶ 39 and/or the statute of frauds as a defense(s) to this lawsuit in each of the following ways:

    a.    Confirming the second renewal had been effectuated, in writing, via multiple email communications to A&W;

    b.    Confirming the second renewal, verbally, via multiple phone conferences

with A&W's representations;

c.   Agreeing to submit the "fair market rate" issue – *which, again, is <u>only</u> relevant <u>after</u> the second renewal is/was exercised by A&W* – to a formal appraisal process;

d.   Engaging in lengthy negotiations regarding the "fair market rate," without *ever* questioning the manner in which A&W exercised its second renewal option; and

e.   Causing A&W to reasonably believe that the Lease had been extended and, thus, no further action was required to: (i) preserve its contractual right to same; or (ii) attempt to find a new location for its business operations described, *supra.*

**WHEREFORE**, this Court should enter a declaratory judgment that: (1) finds that FCA waived the right to assert ¶ 39 and/or the statute of frauds as a defense to this lawsuit; and (2) grants any other relief deemed fair and equitable under the circumstances of this case.

## COUNT III
## <u>DECLARATORY JUDGMENT (EQUITABLE ESTOPPEL)</u>

52.   Plaintiff restates all prior allegations as if fully set forth herein.

53.   Under Michigan law, equitable estoppel precludes a party from exercising contractual rights because of his own inequitable conduct toward the party asserting the estoppel. *Bloemaker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436,

–13–

443-44 (6th Cir. 2010).

54.   For equitable estoppel to apply, the party asserting estoppel must establish that:

    a.   The defendant's acts or representations induced the plaintiff to believe that the pertinent clause would not be enforced;

    b.   The plaintiff justifiably relied on this belief; and

    c.   The defendant was prejudiced as a result of its reliance on its belief. *Morales v. Auto–Owners Ins. Co.*, 458 Mich. 288, 295-97; 582 N.W.2d 776 (1998).

55.   Along similar lines, and as noted by the Michigan Court of Appeals:

> Defendant[] cannot be allowed to cajole plaintiff[] into believing that verbal notification was sufficient and then wait silently until the option's expiration date to assert technical deficiencies in the plaintiff's performance.

*Pieger v. Bouwman*, 61 Mich. App. 558, 561; 233 N.W.2d 82 (1975).

56.   Here, FCA should be equitably estopped from raising ¶ 39 and/or the statute of frauds as a defense(s) in this case because:

    a.   FCA confirmed the second renewal had been effectuated, in writing, via multiple email communications to A&W;

    b.   FCA confirmed the second renewal, verbally, via multiple phone conferences with A&W's representations;

    c.   FCA agreed to submit the "fair market rate" issue – *which, again, is <u>only</u> relevant <u>after</u> the second renewal is/was exercised by A&W* – to a formal appraisal process;

d. FCA engaged in lengthy negotiations regarding the "fair market rate," without *ever* questioning the manner in which A&W exercised its second renewal option;

e. FCA caused A&W to believe that the Lease had been extended and, thus, no further action was required to preserve its contractual right to same;

f. A&W justifiably relied on its belief that the Lease had been extended and, in turn, it: (i) incurred significant costs/expenses/etc. relative to the Subject Property; and (ii) did not look for an alternative location for its trucking operations; and

g. A&W will be prejudiced if FCA is permitted to repudiate the parties' Lease because it will be forced to close its business which will cause a significant disruption of the delivery of essential items such as food and medical supplies.

**WHEREFORE**, this Court should enter a declaratory judgment that: (1) finds that FCA's ¶ 39 and/or statute of frauds defense is barred by the doctrine of equitable estoppel; and (2) grants any other relief deemed fair and equitable under the circumstances of this case.

## COUNT IV
## DECLARATORY JUDGMENT (PARTIAL PERFORMANCE)

57. Plaintiff restates all prior allegations as if fully set forth herein.

58. Under Michigan law, partial performance may remove a given contract from the

operation of the statute of frauds. *Zaborski v. Kutyla*, 29 Mich. App. 604, 607; 185

N.W.2d 586 (1971).

59.     The doctrine of partial performance has been explained in the following terms:

> If one party to an oral contract, in reliance upon the contract, has performed his obligation thereunder so that it would be a fraud upon him to allow the other party to repudiate the contract, by interposing the statute, equity will regard the contract as removed from the operation of the statute.

*Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 540, 473 N.W.2d 652 (1991).

60.     Here, equity should remove the second renewal option from the operation of ¶

39 and/or the statute of frauds because:

a.  FCA confirmed that the second renewal had been effectuated, in writing, via multiple email communications to A&W;

b.  FCA confirmed the second renewal, verbally, via multiple phone conferences with A&W's representations;

c.  FCA agreed to submit the "fair market rate" issue – *which, again, is only relevant after the second renewal is/was exercised by A&W* – to a formal appraisal process;

d.  FCA engaged in lengthy negotiations regarding the "fair market rate," without *ever* questioning the manner in which A&W had exercised its second renewal option;

e.  FCA caused A&W to believe that the Lease had been extended and, thus,

no further action was required to preserve its contractual right to same;

f.   A&W justifiably relied on its belief that the Lease had been extended and, in turn, it: (i) incurred significant costs/expenses/etc. relative to the Subject Property; and (ii) did not look for an alternative location for its trucking operations; and

g.   A&W will be prejudiced if FCA is permitted to repudiate the parties' Lease because it will be forced to close its business.

**WHEREFORE**, this Court should enter a declaratory judgment that: (1) finds that FCA's ¶ 39 and/or statute of frauds defense is barred by the doctrine of partial performance; and (2) grants any other relief deemed fair and equitable under the circumstances of this case.

**COUNT V**
**DECLARATORY JUDGMENT (FAIR MARKET VALUE)**

61.   Plaintiff restates all prior allegations as if fully set forth herein.

62.   The parties' Lease provides that, with respect to the second renewal term, A&W would pay rent to FCA at a "fair market rate."

63.   The Lease does not define the phrase "fair market rate," nor does it establish a mechanism to determine the amount of rent to paid during this term.

64.   Nothing in the Lease gives FCA the unilateral right to determine the "fair market rate" for the Subject Property.

65.   The Lease has been properly extended for another 5-year term; however, the

amount of rent due-and-owing has yet to be determined.

66.   Accordingly, this Court should determine the applicable "fair market rate" for the Subject Property.

   **WHEREFORE**, this Court should enter a declaratory judgment that: (1) determines the current "fair market rate" for the Subject Property; and (2) grants any other relief deemed fair and equitable under the circumstances of this case.

Respectfully submitted,

**GIARMARCO, MULLINS & HORTON, P.C.**

By: */s/ Ryan Lee Perry*
   Ryan Lee Perry (P55545)
   Geoffrey S. Wagner (P70839)
   Attorneys for Plaintiff

Dated:  September 20, 2021

# EXHIBIT A



Conju

2301 W. Big Beaver Rd.
Suite 625
Troy, MI 48084-3329

(248) 637-9700
Facsimile (248) 637-9897
www.Lmcap.com

1. **THIS LEASE** Made this _____ day of July, 2011 by and between Dunn & Mavis, Inc., the Lessor, hereinafter designated as the Landlord, and A & W X-PRESS, INC. the Lessee, hereinafter designated as the Tenant.

2. **DESCRIPTION:** WITNESSETH: The Landlord, in consideration of the rents to be paid and the covenants and agreements to be performed by the Tenant, does hereby lease unto the Tenant a 23,350 square foot industrial facility on approximately 10.68 acres, situated in the City of Warren, County of Macomb, State of Michigan to-wit: 22077 Mound Road, Warren, Michigan. Property is identified on Exhibit "A" attached hereto and made a part hereof.

3. **TERM:** For the term of five (5) years from and after the first (1st) day of September, 2011, and expiring the thirty-first (31st) day of August, 2016 fully to be completed and ended, the Tenant yielding and paying during the continuance of this Lease unto the Landlord for rent of said premises for said term, the sum of: Five Hundred Fifty Five Thousand and 00/100 ($555,000.00) Dollars on the first day of each and every month as follows:

|  | Annual | Monthly |
|---|---|---|
| Months 1-60 | $ 111,000.00 | $ 9,250.00 |

Landlord hereby acknowledges receipt of $9,250 for September 2011 rent as well as $9,250 for Security Deposit as noted in Section 41 of this Lease Agreement.

4. **RENT:** The Tenant hereby hires the said premises for the said term as above mentioned and covenants well and truly to pay, or cause to be paid unto the Landlord at the dates and times above mentioned, the rent above reserved.

5. **GROSS LEASE:** Landlord and Tenant acknowledge that this is a Gross Lease. The Landlord, at its sole cost and expense, shall be responsible for maintenance of the roof and the four (4) outer walls, and payment of real property taxes and building insurance .Tenant, at its sole cost and expense, shall be responsible for all other costs associated with maintaining the Premises. Therefore,

(a)     commencing September 1, 2011 and throughout the term of this Lease, Tenant shall pay all other operating expenses with respect to the management, operation, service and maintenance of the Premises. Operating expenses shall include, but not be limited to, (i) electricity, gas, water and other utility charges for the Premises; (ii) repair and maintenance of HVAC systems, irrigation systems and mechanical systems; (iii) trash removal; (iv) personal property taxes; and (v) snow and ice removal, maintenance of parking areas, driveways and sidewalks as well as lawn/garden maintenance and fertilization.

(b)     In the event the real estate taxes assessed against the premises increase during the term of this Lease using the assessment issued by the City of Warren, then in that event, the Tenant agrees to pay the full amount of said increase as additional rental commencing upon Landlord's presentation of new tax bills providing proof of any said increase as mentioned above.

6. **INSURANCE AND WAIVER OF SUBROGATION:** At all times during the term of this Lease, Tenant will carry and maintain, at Tenant's expense, the following insurance, in the amounts specified below or such other amounts as Landlord may from time to time reasonably request, with insurance companies and on forms satisfactory to Landlord:

(a)     Bodily injury and property damage liability insurance, with a combined single occurrence limit of not less than $2,000,000. All such insurance will be equivalent to coverage offered by a commercial comprehensive general liability form, including without limitation personal injury, products and completed operations, broad form property damage, and contractual liability coverage for the performance by Tenant of the indemnity agreements set forth in this Section;

(b)     Insurance covering all of Tenant's furniture and fixtures, machinery, equipment, stock, and any other



personal property owned and used in Tenant's business and found in, on, or about the Premises, and any leasehold improvements to the Premises, in an amount not less than the full replacement cost. Property forms will provide coverage on a broad form basis insuring against "all risks of direct physical loss." All policy proceeds will be used for the repair or replacement of the property damaged or destroyed;

(c)     Worker's compensation insurance insuring against and satisfying Tenant's obligations and liabilities under the worker's compensation laws of the state of Michigan, including employer's liability insurance in the limits required by the laws of the State of Michigan; and

At all times during the term of this Lease, Landlord will carry and maintain, at Landlord's expense, the following insurance, with an insurance company and on forms satisfactory to Landlord:

(a)     A primary policy of fire and extended insurance covering the Premises in an amount not less than the full replacement cost. Landlord will retain in its possession the original policy and all endorsements, renewal certificates and new policies, if any, issued during the Term, but will provide Tenant, upon request, certificates evidencing the existence of the policy.

(b)     In the event the cost of fire and extended coverage insurance shall increase during the term of this Lease, then in that event, the Tenant agrees to pay the full amount of said increase as additional rental commencing upon Landlord's presentation of new insurance premiums providing proof of any said increase as mentioned above.

If Tenant fails to obtain or maintain any insurance required hereunder, Landlord shall have the option, without assuming any obligation in connection therewith, to affect such insurance at the sole cost of the Tenant and all outlays by Landlord shall be reimbursed by Tenant to Landlord as Additional Rent.

Certificates of insurance, together with copies of the endorsements, when applicable, naming Landlord as additional insured, will be delivered to Landlord prior to Tenant's occupancy of the Premises and from time to time at least 10 days prior to the expiration of the term of each such policy. All commercial general liability or comparable policies maintained by Tenant will name Landlord, as additional insured. All such policies maintained by Tenant will provide that they may not be terminated nor may coverage be reduced except after 30 days' prior written notice to Landlord. All commercial general liability, automobile, and property policies maintained by Tenant will be written as primary policies, not contributing with and not supplemental to the coverage that Landlord may carry.

Landlord and Tenant each waive any and all rights to recover against the other, or against the officers, directors, shareholders, partners, joint venturers, employees, agents, customers, invitees, or business visitors of such other party for any loss or damage to such waiving party arising from any cause covered by any property insurance required to be carried by such party pursuant to this or any other property insurance actually carried by such party to the extent of the limits of such policy. Landlord and Tenant from time to time will cause their respective insurers to issue appropriate waiver of subrogation rights endorsements to all property insurance policies carried in connection with the Premises or the contents of the Premises.

7. **LATE FEE:**  If the Tenant shall default in any payment or expenditure other than rent required to be paid or expended by the Tenant under the terms hereof, the Landlord may at his option make such payment or expenditure, in which event the amount thereof shall be payable as rental to the Landlord by the Tenant on the next ensuing rent day together with interest at eight (8%) percent per annum from the date of such payment or expenditure by the Landlord and on default in such payment the Landlord shall have the same remedies as on default in payment of rent.

If any installment of rent is unpaid for five (5) days after its due date, Tenant will pay a late fee equal to eight (8%) percent per annum of the amount of overdue rent.

8. **PLACE OF PAYMENT:**  All payments of rent or other sums to be made to the Landlord shall be made at the address noted in Section 33 or at such place as the Landlord shall designate in writing from time to time.

9. **ASSIGNMENT:**  The Tenant covenants not to assign or transfer this Lease or hypothecate or mortgage the same or sublet said premises or any part thereof without the written consent of the Landlord. Any assignment, transfer, hypothecation, mortgage or subletting without said written consent shall give the Landlord the right to terminate his Lease and to re-enter and repossess the leased premises. Notwithstanding the foregoing, Landlord acknowledges that Tenant may sublease certain areas of the vacant parcel to customers for the purpose of truck & trailer storage. In no event, shall Tenant sublease any part of the Premises to a Subtenant, or Subtenants, for an



amount, whether it is individually or collectively, greater than what Tenant is paying under the terms and conditions of this Lease. In the event that this occurs, Tenant shall forward these additional funds to Landlord along with its monthly rental.

**10. BANKRUPTCY AND INSOLVENCY:** The Tenant agrees that if the estate created hereby shall be taken in execution, or by other process of law or if the Tenant shall be declared bankrupt or insolvent, according to law, or any receiver be appointed for the business and property of the Tenant, or if any assignment shall be made of the Tenant's property for the benefit of creditors, then and in such event this Lease may be canceled at the option of the Landlord.

**11. RIGHT TO MORTGAGE:** The Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any mortgage or mortgages now or hereafter placed upon the Landlord's interest in the said premises and on the land and buildings of which the said premises are a part or upon any buildings hereafter placed upon the land of which the leased premises form a part. And the Tenant covenants and agrees to execute and deliver upon demand such further instrument or instruments subordinating this Lease to the lien of any such mortgage or mortgages as shall be desired by the Landlord and any mortgagees or proposed mortgagees and hereby irrevocably appoints the Landlord the attorney-in-fact of the Tenant to execute and deliver any such instrument or instruments for and in the name of the Tenant.

**12. USE AND OCCUPANCY:** It is understood and agreed between the parties hereto that said premises during the continuance of this Lease shall be used and occupied for <u>truck repair and storage of trucks and food-related items</u> and for no other purpose or purposes without the written consent of the Landlord, and that the Tenant will not use the premises for any purpose in violation of any law, municipal ordinance or regulation, and that on any breach of this agreement the Landlord may at his option terminate this Lease forthwith and re-enter and repossess the leased premises.

**13. CERTIFICATE OF OCCUPANCY:** It is Tenant's obligation to submit an application for Certificate of Occupancy and pay all associated fees with said application immediately upon full execution of this Lease Agreement. Landlord, at its sole cost and expense, is obligated to cure any pre-existing code violations. Tenant will be responsible to cure any code violations specific to its own use.

**14. FIRE:** It is understood and agreed that if the premises hereby leased be damaged or destroyed in whole or in part by fire or other casualty during the term hereof, the Landlord will repair and restore the same to good tenantable condition with reasonable dispatch, and that the rent herein provided for shall abate entirely in case the entire premises are untenantable and pro rata for the portion rendered untenantable, in case a part only is untenantable, until the same shall be restored to a tenantable condition; provided, however, that if the Tenant shall fail to adjust his own insurance or to remove his damaged goods, wares, equipment or property within a reasonable time, and as a result thereof the repairing and restoration is delayed, there shall be no abatement of rental during the period of such resulting delay, and provided further that there shall be no abatement of rental if such fire or other cause damaging or destroying the leased premises shall result from the negligence or willful act of the Tenant, his agents or employees, and provided further that if the Tenant shall use any part of the leased premises for storage during the period of repair a reasonable charge shall be made therefore against the Tenant, and provided further that in case the leased premises, or the building of which they are a part, shall be destroyed to the extent of more than one-half of the value thereof, the Landlord may at his option terminate this Lease forthwith by a written notice to the Tenant.

**15. LANDLORD REPAIRS:** The Landlord after receiving written notice from the Tenant and having reasonable opportunity thereafter to obtain the necessary workmen therefore agrees to keep in good order and repair the roof and the four outer walls of the premises but not the doors, door frames, the window glass, window casings, window frames, windows or any of the appliances or appurtenances of said doors or window casings, window frames and windows, or any attachment thereto or attachments to said building or premises used in connection therewith.

**16. TENANT REPAIRS AND ALTERATIONS:** Except as provided in Section 14 and 15 hereof, the Tenant further covenants and agrees that he will, at his own expense, during the continuation of this lease, keep the said premises and every part thereof in as good repair and at the expiration of the term yield and deliver up the same in like condition as when taken, reasonable use and wear thereof and damage by the elements excepted. The Tenant shall not make any alterations, additions or improvements to said premises without the Landlord's written consent, and all alterations, additions or improvements made by either of the parties hereto upon the premises, except movable office furniture and trade fixtures put in at the expense of the Tenant, shall be the property of the Landlord, and shall remain upon and be surrendered with the premises at the termination of this Lease, without molestation or injury.



Notwithstanding the foregoing, Tenant will make the following improvements to the Premises, at its sole cost and expense:

- add a double truck well to the rear of the building
- remove some of the interior walls in warehouse (based on engineering approval)
- clean and paint as needed in warehouse
- modify office layout
- clean entire yard area
- remove shed and dock high area behind the building
- grade the rear lot as necessary
- tighten and secure fencing as necessary

Tenant will engage licensed and insured contractors to conduct these improvements. Said contractors will apply and receive permits, when required, prior to any work being done. Furthermore, once a detailed plan is in place, Tenant must receive Landlord's prior written consent before any improvements are conducted. Landlord shall not unreasonably withhold consent.

**17. EMINENT DOMAIN:** If the whole or any part of the premises hereby leased shall be taken by any public authority under the power of eminent domain, then the term of this Lease shall cease on the part so taken, from the day the possession of that part shall be required for any public purpose and the rent shall be paid up to that day and from that day the Tenant shall have the right either to cancel this Lease and declare the same null and void or to continue in the possession of the remainder of the same under the terms herein provided, except that the rent shall be reduced in proportion to the amount of the premises taken. All damages awarded for such taking shall belong to and be the property of the Landlord whether such damages shall be awarded as compensation for diminution in value to the leasehold or the fee of the premises herein leased; provided however, that the Landlord shall not be entitled to any portion of the award to the Tenant for loss of business.

**18. RESERVATION:** The Landlord reserves the right of free access at all times to the roof of said leased premises and reserves the right to rent said roof for advertising purposes. The Tenant shall not erect any structures for storage or any aerial, or use the roof for any purpose without the consent in writing of the Landlord.

**19. CARE OF PREMISES:** The Tenant shall not perform any acts or carry on any practices which may injure the building or be a nuisance or menace to other Tenants in the building and shall keep premises under his control (including adjoining drives, streets, alleys or yards) clean and free from rubbish, dirt, snow and ice at all times, and it is further agreed that in the event the Tenant shall not comply with these provisions, the Landlord may enter upon said premises and have rubbish, dirt and ashes removed and the side walks cleaned, in which event the Tenant agrees to pay all charges that the Landlord shall pay for hauling rubbish, ashes and dirt, or cleaning walks. Said charges shall be paid to the Landlord by the Tenant as soon as bill is presented to him and the Landlord shall have the same remedy as is provided in Section 7 of this Lease in the event of Tenant's failure to pay.

Furthermore, the Tenant shall at his own expense under penalty of forfeiture and damages promptly comply with all lawful laws, orders, regulations or ordinances of all municipal, County and State authorities affecting the premises hereby leased and the cleanliness, safety, occupation and use of same.

**20. CONDITION OF PREMISES AT TIME OF LEASE:** The Tenant further acknowledges that he has examined the said leased premises prior to the making of this Lease and knows the condition thereof, and that no representations as to the condition or state of repairs thereof have been made by the Landlord, or his agent, which are not herein expressed, and the Tenant hereby accepts the leased premises in their present condition at the date of the execution of this Lease, except as provided in Section 12 and 14 contained herein. Notwithstanding the foregoing, Landlord shall provide new carpeting throughout the office area upon Lease Commencement.

**21. CONTIGUOUS PROPERTY:** The Landlord shall not be responsible or liable to the Tenant for any loss or damage that may be occasioned by or through the acts or omissions of persons occupying adjoining premises or any part of the premises adjacent to or connected with the premises hereby leased or any part of the building of which the leased premises are a part or for any loss or damage resulting to the Tenant or his property from bursting, stoppage or leaking of water, gas, sewer or steam pipes.

**22. RE-RENTING:** The Tenant hereby agrees that for a period commencing one hundred twenty (120) days prior to the termination of this Lease, the Landlord may show the premises to prospective Tenants, and ninety



(90) days prior to the termination of this Lease, may display in and about said premises and in the windows thereof, the usual and ordinary "TO RENT" signs.

23. **HOLDING OVER:** It is hereby agreed that in the event of the Tenant herein holding over after the termination of this Lease thereafter the tenancy shall be from month to month in the absence of a written agreement to the contrary.

24. **GAS, WATER, HEAT, ELECTRICITY:** The Tenant will pay all charges made against said leased premises for gas, water, heat and electricity during the continuance of this Lease, as the same shall become due.

25. **ADVERTISING DISPLAY:** It is further agreed that all signs and advertising displayed in and about the premises shall be such only as advertise the business carried on upon said premises, and that the Landlord shall control the character and size thereof and that no sign shall be displayed excepting such as shall be approved in writing by the Landlord, and that no awning shall be installed or used on the exterior of said building unless approved in writing by the Landlord.

26. **ACCESS TO PREMISES:** The Landlord shall have the right to enter upon the leased premises at all reasonable hours for the purpose of inspecting the same. If the Landlord deems any repairs necessary he may demand that the Tenant make the same and if the Tenant refuses or neglects forthwith to commence such repairs and complete the same with reasonable dispatch the Landlord may make or cause to be made such repairs and shall not be responsible to the Tenant for any loss or damage that may accrue to his stock or business by reason thereof, and if the Landlord makes or causes to be made such repairs the Tenant agrees that he will forthwith on demand pay to the Landlord the cost thereof with interest at eight (8%) percent per annum, and if he shall make default in such payment the Landlord shall have the remedies provided in Section 7 hereof.

27. **RE-ENTRY:** In case any rent shall be due and unpaid or if default be made in any of the covenants herein contained, or if said leased premises shall be deserted or vacated, then it shall be lawful for the Landlord, his certain attorney, heirs representatives and assigns, to re-enter into, re-possess the said premises and the Tenant and each and every occupant to remove and put out.

28. **QUIET ENJOYMENT:** The Landlord covenants that the said Tenant, on payment of all the aforesaid installments and performing all the covenants aforesaid, shall and may peacefully and quietly have, hold and enjoy the said demised premises for the term aforesaid.

29. **EXPENSES-DAMAGES, RE-ENTRY:** In the event that the Landlord shall, during the period covered by this Lease, obtain possession of said premises by re-entry, summary proceedings, or otherwise, the Tenant hereby agrees to pay the Landlord the expense incurred in obtaining possession of said premises, and also all expenses and commissions which may be paid in and about the letting of the same, and all other damages.

30. **REMEDIES NOT EXCLUSIVE:** It is agreed that each and every of the rights, remedies and benefits provided by this Lease shall be cumulative, and shall not be exclusive of any other of said rights, remedies and benefits, or of any other rights, remedies and benefits allowed by law.

31. **WAIVER:** One or more waivers of any covenant or condition by the Landlord shall not be construed as a waiver of a further breach of the same covenant or condition.

32. **DELAY OF POSSESSION:** It is understood that if the Tenant shall be unable to enter into and occupy the premises hereby leased at the time above provided, by reason of the said premises not being ready for occupancy, or by reason of the holding over of any previous occupant of said premises, or as a result of any cause or reason beyond the direct control of the Landlord, the Landlord shall not be liable in damages to the Tenant therefore, but during the period the Tenant shall be unable to occupy said premises as hereinbefore provided, the rents therefore shall be abated and the Landlord is to be the sole judge as to when the premises are ready for occupancy.

33. **NOTICE OR DEMANDS:** All notices, demands and requests required or permitted to be given under the provisions of this Lease Agreement shall be in writing and shall be deemed given (a) when personally delivered to the party to be given such notice or other communication, (b) on the business day that such notice or other communication is sent by facsimile or similar electronic device, fully prepaid, which facsimile or similar electronic communication shall promptly be confirmed by written notice, (c) on the third business day following the date of deposit in the United States mail if such notice or other communication is sent by certified or registered mail with return receipt requested and postage thereon fully prepaid, or (d) on the business day following the day such notice



or other communication is sent by reputable overnight courier to the following:

If to Landlord:     Dunn & Mavis, Inc.
                    c/o Damien Mavis
                    P.O. Box 12910
                    San Luis Obispo, CA 93406

If to Tenant:       A & W X-Press, Inc.
                    c/o _____
                    _____
                    _____

or to such other address as the parties may designate in writing.

34. **USE OF PRONOUNS:** It is agreed that in this Lease the word "he" shall be used as synonymous with the words "she," "it" and "they," and the word "his" synonymous with the words "her," "its" and "their."

35. **SUCCESSORS AND ASSIGNS:** The covenants, conditions and agreements made and entered into by the parties hereto are declared binding on their respective heirs, successors, representatives and assigns.

36. **SECURITY PROVISION:** In the event security is given, Section 41 shall be deemed a part of this Lease.

37. **LEGAL APPROVAL:** This Lease has been prepared by Landlord or its authorized representation for submission to Tenant for approval. No representation or recommendation is made by L. MASON CAPITANI, INC. as to the legal sufficiency, legal effect or tax consequences of this Lease or the transaction relating thereto; and the parties shall rely solely upon the advice of their own legal counsel as to the legal and tax consequences of this Lease.

38. **L. MASON CAPITANI, INC. (BROKER) NOTICE TO LANDLORDS AND TENANTS REGARDING HAZARDOUS WASTES OR SUBSTANCES AND UNDERGROUND STORAGE TANKS:** Although Broker will disclose any knowledge it actually possesses with respect to the existence of hazardous wastes or substances, or underground storage tanks on the property, Broker has not made investigations or obtained reports regarding the subject matter of this Notice, except as may be described in a separate written document signed by Broker. Broker makes no representations regarding the existence or nonexistence of hazardous wastes or substances, or underground storage tanks on the property and both parties agree to hold L. Mason Capitani, Inc. harmless. You should contact a professional, such as a civil engineer, geologist, industrial hygienist or other persons with experience in these matters to advise you concerning the property.

39. **OPTION TO RENEW:** Provided Tenant has never been in default of the terms and conditions of the Lease, Landlord shall grant Tenant two (2) Options to Renew the Lease Agreement for five (5) year Lease Term. Should Tenant elect to exercise its Option, Tenant shall provide Landlord with ninety (90) days advance written notice, return receipt requested. The rent schedule for the first five (5) year Renewal Term shall be at a monthly rate of $9,750.00. The rent schedule for the second Renewal Term shall be at a fair market rate.

40. **RIGHT OF FIRST REFUSAL:** Provided this Lease is in full force and effect, Tenant is not in default and Tenant never exercised its Option to Purchase, Landlord will grant Tenant a Right of First Refusal. Landlord will grant Tenant this Right from during the original Lease Term. Should Landlord receive a bona fide Offer to Purchase for the Premises during this time frame, Landlord shall provide Tenant with written notice. Tenant shall have fifteen (15) days thereafter to exercise it Right of First Refusal. Tenant shall provide Landlord with written notice of its intentions prior to the expiration of this time period. In the event that the Tenant fails to exercise its right of first refusal, such right, together with the Option to Purchase, shall terminate.

IN WITNESS WHEREOF, The parties have hereunto set their hands and seals the day and year first above written

WITNESSED:                          TENANT: A & W X-PRESS, INC., a Michigan Corporation

6

**L. MASON CAPITANI**

CORFAC

By: _____

Its: _____

LANDLORD:  DUNN & MAVIS, INC., an Indiana Corporation

By: _____
       Damien Mavis

Its: _____

7



# SECURITY PROVISION

**41.** The Landlord herewith acknowledges the receipt of <u>Nine Thousand Two Hundred Fifty and 00/100</u> <u>($9,250.00)</u> Dollars which he is to retain as security for the faithful performance of all of the covenants, conditions and agreements of this Lease, but in no event shall the Landlord be obliged to apply the same upon rents or other charges in arrears or upon damages for the tenants' failure to perform the said covenants, conditions, and agreements; the Landlord may so apply the security at his option; and the Landlord's right to the possession of the premises for non-payment of rent or for any other reason shall not in any event be affected by reason of the fact that the Landlord holds this security. The said sum if not applied toward the payment of rent in arrears or toward the payment of damages suffered by the Landlord by reason of the Tenant's breach of the covenants, conditions, and agreements of this Lease is to be returned to the Tenant when this Lease is terminated, according to these terms, and in no event is the said security to be returned until the Tenant has vacated the premises and delivered possession to the Landlord.

In the event that the Landlord repossesses himself of the said premises because of the Tenant's default or because of the Tenant's failure to carry out the covenants, conditions, and agreements of this Lease, the Landlord may apply the said security upon all damages suffered to the date of said repossession and may retain the said security to apply upon such damages as may be suffered or shall accrue thereafter by reason of the Tenant's default or breach. The Landlord shall not be obligated to keep the said security as a separate fund, but may mix the said security with his own funds.

LANDLORD: DUNN & MAVIS, INC.

By: _____

      Damien Mavis



**EXHIBIT "A"**

## AMENDMENT TO LEASE AGREEMENT

This Amendment to a Lease Agreement is dated this _22_ day of September, 2011 by and between Dunn & Mavis, Inc. whose business mailing address is P.O. Box 12910, San Luis Obispo, CA 93406 ("Landlord") and A & W X-Press, whose business address as of lease commencement will be 22077 Mound Road, Warren, MI 48091 ("Tenant").

WHEREAS, on the 31st day of August, 2011, Landlord and Tenant did enter into a certain Lease Agreement ("Agreement") for a 23,350 square foot industrial facility on approximately 10.68 acres, more commonly known as 22077 Mound Road, Warren, Michigan ("Premises").

## NOW THERFORE IN CONSIDERATION OF THE MUTUAL AGREEMENTS SET FORTH, IT IS HEREBY AGREED AS FOLLOWS:

1.   Landlord has committed to pay a third party licensed contractor ("Contractor") up to Thirty Thousand and 00/100 ($30,000.00) Dollars to cure existing code violations, install new carpeting in the office area and replace one (1) damaged overhead door. Said Landlord commitment is subject to the full execution of a contract between Landlord and Contractor. It has been previously conveyed to Landlord that a deposit equal to Ten Thousand and 00/100 ($10,000.00) Dollars will need to be remitted to Contractor upon full execution of said contract.

2.   Tenant will coordinate and oversee all improvements that Contractor will be making to the Premises. Landlord will simply be obligated to compensate Contractor as noted above.

3.   Tenant will be responsible to secure its Certificate of Occupancy.

4.   Tenant, at its sole cost and expense, shall be responsible to pay any fees to Contractor associated with the above stated work above and beyond Thirty Thousand and 00/100 ($30,000.00) Dollars.

5.   In all other respects the terms, covenants and conditions of the Agreement by and between Landlord and Tenant shall remain in full force and effect.

### SIGNATURE PAGE TO FOLLOW

Tenant Initials _____ Landlord Initials _____

**IN WITNESS THEROF,** the parties have executed this Amendment to Lease Agreement the day and year first above written.

TENANT:  A & W X-Press, Inc.

By: *Lisa Wood*
Lisa Wood, President


LANDLORD: Dunn & Mavis, Inc.

By: *Damien Mavis*
Damien Mavis, Owner

# EXHIBIT B

**NOTICE TO TENANT**

December 2, 2019

A&W X-Press, Inc.
22207 Mound Road
Warren, Michigan  48091

**RE:**    Lease between Dunn & Mavis, Inc., as landlord, and A&W X-PRESS, INC., a Michigan corporation, as tenant, ("Tenant"), dated August 31, 2011, as amended by that certain Amendment to Lease Agreement dated September 22, 2011, and that certain Second Amendment to Lease dated June __, 2016 for certain property located at 22077 Mound Road, Warren, Michigan, ( the "**Property**").

Dear Tenant:

Please be advised that on this date DUNN & MAVIS, INC., an Indiana corporation (the "Prior Owner"), has transferred ownership of the Property to FCA US LLC, a Delaware limited liability company (the "New Owner") as of the date set forth above. In connection with such sale, Prior Owner has assigned and transferred its interest in your lease and the security deposit thereunder or relating thereto to New Owner.

Accordingly, (a) all your obligations under the lease from and after the date hereof, including your obligation to pay rent, shall be performable to and for the benefit of New Owner, its successors and assigns, and (b) your insurance policy or policies required to be maintained by you under the lease shall be amended to name New Owner as an additional insured (please provide a certificate of insurance evidencing such coverage within 30 days after the date of this letter).

Unless and until you are otherwise notified in writing by New Owner, the address of New Owner for all purposes under your lease is as set forth on Exhibit A hereto. Please send all further rental payments under the lease to the New Owner to the address designated on Exhibit A for receipt of such payments, unless otherwise directed by the New Owner.

"**PRIOR OWNER**"
DUNN & MAVIS, INC., an Indiana corporation

By: _____
Name:  Damien Mavis
Title:  President

**"NEW OWNER"**
FCA US LLC, a
Delaware limited liability company

By: _Gretchen Canego_
Name: _Gretchen Canego_
Title: _Director-Treasury_

## EXHIBIT A TO TENANT NOTICE

### ADDRESS OF NEW OWNER

For Notices:

> FCA US LLC
> 1000 Chrysler Drive
> CIMS 485-12-78
> Auburn Hills, Michigan 48326
> Attn:  Manager, Corporate Real Estate

with a copy to :

> FCA US LLC
> 1000 Chrysler Drive
> CIMS 485-14-23
> Auburn Hills, Michigan  48326
> Attention:  Counsel, Real Estate
> Office of the General Counsel

For Rent:

Lease rent payment instructions are to <u>send wire transfers or (ACH/EFT) electronic payments</u> as follows.

| | |
|---|---|
| ABA #: | 021000021 (ACH /Wire) |
| Swift Code: | CHASUS33 |
| Bank: | JPMorgan Chase Bank |
| | 4 New York Plaza |
| | New York, NY 10004 |
| Account Number: | 144025784 |
| Reference: | FCA US LLC, G589, 2452, 24529999, 40500034 |
| Attn: | FCA US LLC, G589, 2452, 24529999, 40500034 |

# EXHIBIT C

## EXHIBIT F

## FORM OF TENANT ESTOPPEL CERTIFICATE

To:     Dunn & Mavis, Inc., an Indiana corporation ("Current Landlord"), and

FCA US LLC, a Delaware limited liability company ("New Landlord")

Re:     "Lease" dated August 31, 2011 between Current Landlord and A&W X-PRESS, Inc. as "Tenant" with respect to "Premises" described in the Lease as 23,350 square foot industrial facility on approximately 10.68 acres and which are a part of the "Property" located in 22077 Mound Road, Warrant, MI.

Ladies and Gentlemen:

Tenant has been informed that New Landlord is contemplating purchasing the Property. This estoppel certificate and agreement ("Agreement") is furnished by Tenant to Landlord (New Landlord, together with Current Landlord, "Landlord"). Tenant understands that Landlord is relying on Tenant's statements and agreements in connection with purchasing the Property.

Tenant hereby represents and certifies to, and agrees with, Landlord, as set forth below.

1.      The Lease has not been assigned, amended or modified in any way, nor have the Premises been sublet in whole or in part, except for the following [list any assignments, amendments, or modifications by title and date; if no exceptions are stated, there are NONE]:

Amendment to Lease Agreement dated September 22, 2011

Second Amendment to Lease Agreement dated June 2016

2.      The Lease constitutes the entire agreement between Tenant and Landlord concerning the Premises and has not been assigned, amended or modified except as referenced at paragraph 1 above and there are no other promises, agreements, understandings, side letters or other arrangements relating to the Premises or the Property.

3.      The Lease is presently in full force and effect according to its terms and is the valid and binding obligation of Tenant.

4.      Neither Tenant nor Landlord is in default under the Lease nor does any state of facts exist which with the passage of time or the giving of notice, or both, could constitute a default under the Lease.

5.      All conditions under the Lease to be satisfied by Landlord as of the date hereof (including, without limitation, all work, if any, to be performed by Landlord in the Premises or the Property) have been satisfied, and all contributions, if any, required to be

paid by Landlord under the Lease to date for improvements to the Premises have been paid, except as hereafter stated [if no exceptions are stated, there are NONE]:
NONE

6.     Tenant is in possession of the Premises and is fully obligated to pay and is paying the rent and other charges due under the Lease and is fully obligated to perform and is performing all of the other obligations of Tenant under the Lease, except as hereafter stated [if no exceptions are stated, there are NONE]:
NONE

7.     The     expiration     date     of     the     current     term     of     the     Lease     is 9/30/2021, with an additional five yr. option .

8.     The Lease does not provide for any payments (including, without limitation, rent credits) by Landlord to Tenant which are presently due and payable, or which are due and payable in the future, except as hereafter stated [if no such payments or credits are stated, there are NONE]:
NONE

9.     On this date, to the best of Tenant's knowledge, there are no existing defenses or off-sets which Tenant has against the enforcement of the Lease by Landlord, except as hereafter stated [if no exceptions are stated, there are NONE]:
NONE

10.    The base rent being paid under the Lease is $ 9,750.00          per month ($ 117,000          per annum). Except as hereafter stated, no rent has been paid more than one (1) month in advance of the due date and no security has been deposited with the Landlord [if no advance rents or security deposits are stated, there are NONE]:
Security Deposit of $9,250.00

11.    Except as hereafter stated, Tenant has no options to extend the Lease, to lease additional space at the Property, or to purchase the Property, and the Tenant has no right of refusal with respect to leasing additional space or with respect to purchasing the Property {if no such options or rights of refusal are stated, there are NONE]:
One, five (5) year option remaining after 09/30/2021

12.     There are no actions, whether voluntary or otherwise, pending or threatened against the Tenant, or any guarantor of the Tenant's obligations under the Lease, pursuant to the bankruptcy or insolvency laws of the United States or any similar state laws.

This Agreement shall inure to the benefit of Current Landlord and New Landlord, and their respective successors and assigns, and shall be binding upon Tenant and Tenant's successors and permitted assigns.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the 21 day of 8 , 2019.

TENANT:
[A&W X-PRESS, Inc.]

By: _____
Name: Ray ALmao SAwi
Its: C E O
Hereunto Duly Authorized

STATE OF *Michigan*
COUNTY OF *Wayne* , ss.

On this date, August 21 , 2019, before me, the undersigned notary public, personally appeared Ray Almoosawi , as C E O of A & W xpress , proved to me through satisfactory evidence of identification, which was personal knowledge, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

_____
Notary Public

My commission expires: 27 sep, 2023

S SULTANA
Notary Public - State of Michigan
County of Macomb
My Commission Expires Sep 27, 2023
Acting in the County of Wayne

# EXHIBIT D

## Geoffrey S. Wagner

| | |
|---|---|
| **From:** | Ray Mosawi <Ray@raystransport.com> |
| **Sent:** | Saturday, April 24, 2021 3:47 PM |
| **To:** | George A. Contis |
| **Subject:** | FW: Lease Renewal Option - 22077 Mound Rd, Warren MI |

Down Below copy of the email I received for the lease option renewal.

Thank you

**Ray Mosawi**
**President**
**Ray's Transport Inc**
22077 Mound Road | Warren, MI 48091
Office 586.510.4333 x150 | Fax 888-727-2026
Cell 734.799.2250
Ray@raystransport.com
www.raystransport.com

Please like us on Facebook!

Apply Online!



---

**From:** Ed O'Neill <edward.oneill@external.fcagroup.com>
**Sent:** Wednesday, April 21, 2021 1:33 PM
**To:** Ray Mosawi <Ray@raystransport.com>
**Cc:** Sonego Gretchen (FCA) <gretchen.sonego@fcagroup.com>; Kevin Murray <kevin.murray@fcagroup.com>; Sara E. vonBernthal <sara.vonbernthal@fcagroup.com>
**Subject:** Lease Renewal Option - 22077 Mound Rd, Warren MI

Hi Ray,
As per our conversation a couple of months ago, FCA US US ("FCA") has done research to determine fair market value rates for both industrial buildings and trailer parking lots. Our research has resulted in the below rental rates applicable to the upcoming renewal period. The market rates have been separated for each of (i) the building and (ii) the land for trailer parking.

1

Class C buildings in the Warren area for a Modified Gross lease whereby the Landlord is responsible for real estate taxes, roof, exterior walls and insurance = $8.05/sq ft

Trailer Parking = $200/trailer/month

Based on the above rates and, provided you will never have been in default of the terms and conditions of the Lease, FCA is offerring the below rates for a 5 year renewal.

**Office/Industrial space:**
23,350 sq ft + 2 acres of land @ 8.05/sq ft/yr = $187,967.40/yr ($15,663.95/mo)
**Trailer parking**
@ $200/parking space/mo (33 trailers/acre) = $6,600/mo/acre x 8.68 acres = **$57,200/mo ($686,400/yr)**

**Total Annual Rent = $874,367.40 ($72,863.95/mo)**

Ray, the above renewal rates are significantly above the current rate that you are paying now of $9,750/mo for the building and all the trailer parking land. The real estate market in the Metro Detroit area has significantly increased over the time in which you have been a tenant. The lease that you negotiated with Damien Mavis in 2011 reflected the depressed real estate market at that time. You have been in the current building for 10 years with only a very small increase in rent between the initial term and the first renewal period ($500/mo) while the market has increased significantly over that same time period. Please review and then call me to discuss at your convenience.

**Real Estate Tax Reimbursement:**
As per the lease, the Tenant is responsible for the annual increase in real estate taxes as compared to the previous year. The real estate taxes increased from 2019 to 2020.



The differential between total real estate taxes in 2019 and 2020 is **$20,007.28**. This amount will be billed to you shortly.

Regards,

**Ed O'Neill**

**Stellantis Corporate Real Estate**

Account Director

Cushman Wakefield

1000 Chrysler Drive,

# EXHIBIT E

## Geoffrey S. Wagner

| | |
|---|---|
| **From:** | George A. Contis |
| **Sent:** | Friday, May 21, 2021 11:06 AM |
| **To:** | 'edward.oneill@external.fcagroup.com' |
| **Cc:** | 'Ray Mosawi'; 'preschke@spartanreg.com' |
| **Subject:** | UNSECUREIT Lease Extension A & W X-Press, Inc. (Ray's Transport) / Stellantis / 22077 Mound Road (the "Premises") |
| **Attachments:** | Lease Comps - Eastern Oakland and Macomb (002).pdf; Wick Road Comp.pdf |
| **Importance:** | High |

Dear Mr. O'Neill:

Our office represents Ray Mosawi, principal of A & W Xpress, Inc and Ray's Transport, and at his request, we are corresponding with you regarding the position of Stellantis ("FCA") on what the reset (market) rent should be for the 5 year option term remaining on the lease for 22077 Mound Road.

Our research shows the lease rate you propose for the Warren market is grossly overstated. The first attachment is a snapshot of similarly sized buildings in Eastern Oakland County and the Warren / Roseville / Sterling Heights markets. All the buildings depicted are of a higher quality than the existing building on the Premises and in every instance the asking rent and the actual rent are substantially lower than what you proposed:

- 28120 Hayes Road (Roseville) – 18.2 K SF – **Asking**: $6.00 (Modified Gross)
- 222 Park Drive (Troy) – 23.7 K SF – **Asking**: - $5.25 (Triple Net)
- 35120 Stanley Drive (Sterling Heights) – 26.1 K SF - **Starting**: $5.75 (Triple Net)
- 465 Stephenson Highway (Troy) - 17.5 K SF – **Asking**: $5.75 (Triple Net)
- 26100 Pinehurst (Madison Heights) – 21.3 K SF – **Asking**: $5.95 (Triple Net)
- 1400 Allen (Troy) 27.2 K SF – **Asking**: $6.25 (Triple Net)

The second attachment is most probative based on the size of the parcel despite the subject being in Romulus: 7.58 acres – 40.4 K SF - $6.50 (Gross).

The original lease and amendment were based on an all-inclusive rental rate (the building and all the land) and this should not change. We maintain that a more accurate rental rate / SF is **$6.00.** If you do not agree with our suggested lease rate, the appropriate course of action would be for each party to obtain an MAI appraisal (with agreed upon parameters for establishing the lease rate) from an appraiser that has at least 5 years of experience in the Warren market. If the 2 appraisals are within 10% of each other, the lease rate would be the average of the 2. If the appraisals are not within 10% the 2 appraisers would pick a third appraiser whose sole duty would be to determine which of the 2 is the most accurate (each party would pay for their own appraiser and split the cost for the third appraiser).

Time is definitely of the essence and it is to the mutual benefit of both parties that an acceptable lease rate is established so that the lease amendment can be prepared.

I look forward to hearing from you at your earliest convenience.

Respectfully,

**George A. Contis**
Giarmarco, Mullins & Horton, P.C.

1

101 West Big Beaver Road, Suite 1000
Troy, Michigan  48084-5280
Phone: (248) 457-7063
Cell: (248) 890-6256
Fax: (248) 404-6364
Email: gcontis@gmhlaw.com
www.gmhlaw.com



\*Confidential:  This electronic message and all contents contain information from the law firm of Giarmarco, Mullins & Horton, P.C. which may be privileged, confidential or otherwise protected from disclosure.  Any recipient other than the intended recipient is hereby notified that any disclosure, copy, distribution or use of the contents of this message or any attachments is strictly prohibited.  If you have received this electronic message in error, please notify us immediately by reply e-mail or by phone and destroy the original message, attachments and all copies.\*

IRS Circular 230 Disclosure:  To ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matters addressed in this communication.

# EXHIBIT F

## Geoffrey S. Wagner

| | |
|---|---|
| **From:** | Sara Von Bernthal <sara.vonbernthal@stellantis.com> |
| **Sent:** | Thursday, May 27, 2021 11:18 AM |
| **To:** | George A. Contis |
| **Cc:** | Ed O'Neill |
| **Subject:** | Possible Lease Extension; A & W X-Press, Inc. (Ray's Transport) / FCA US LLC / 22077 Mound Road, Warren, MI (the "Premises") |

Good morning, Mr. Contis.

I am in-house real estate counsel for FCA US LLC ("FCA").

Thank you for your recent emails to Ed O'Neill concerning the fair market rental rate with respect to the upcoming renewal option under the lease for the referenced Premises (the "Lease").

FCA disagrees with your determination of the fair rental rate for the Premises, and believes that your research is flawed for the following reasons:

- Your comparisons are not for properties in Warren, which is a unique and saturated market, wherein industrial properties are in high demand.
- With the exception of the comparison of the property in Roseville, your comparisons all pertain to triple net leases (which are at a much lower rental rate than the rental rate for a modified gross lease, such as the Lease).
- The rental rate for the Premises is not limited to the building.  As you are aware, the Premises consists of a "23,350 square foot industrial facility on 10.68 acres in the City of Warren", as identified on Exhibit "A" to the Lease.  As further evidence that the land is a critical component of the Premises, pursuant to Section 12 of the Lease, Tenant is permitted to use the Premises for "office, truck/trailer repair, and parking/storage of trucks/tractors/trailers and food-related items".
- The Class "C" condition of the Premises was taken into account by FCA in determining fair market rental rate.

As you are aware, the Lease does not require the parties to submit to an appraisal process to determine the fair market rental rate for the Premises.  Accordingly, FCA stands by its determination of the fair market rent for the Premises (inclusive of the truck, tractor and trailer parking and storage areas) based on the going rate for industrial properties in the relevant market, including the current fair market rental rate for truck and trailer parking and storage.

FCA's in-house broker, Ed O'Neill, will be reaching out to your client soon to further discuss this matter.

Regards,

Sara von Bernthal



**Sara Engle von Bernthal**
**Senior Counsel, Real Estate**
**Office of the General Counsel**

STELLANTIS
1000 Chrysler Drive, CIMS 485-14-78
Auburn Hills, MI USA 48326-2766

# EXHIBIT G

## Geoffrey S. Wagner

| | |
|---|---|
| **From:** | George A. Contis |
| **Sent:** | Thursday, May 27, 2021 1:51 PM |
| **To:** | 'Sara Von Bernthal' |
| **Cc:** | 'Ed O'Neill' |
| **Subject:** | RE: Possible Lease Extension; A & W X-Press, Inc. (Ray's Transport) / FCA US LLC / 22077 Mound Road, Warren, MI (the "Premises") |

**Importance:** High

Ms. von Bernthal:

Thank you for responding to my email to Mr. O'Neill; it was forwarded to my client and his real estate broker for further comment. Once I receive their feedback I will share it with you.

You are correct the lease does not include an appraisal component to determine **fair market rate** for the second Renewal Term. Similarly, the lease does not grant landlord administrative fiat to unilaterally establish fair market rate. Until such time as the parties can reach an agreement on how the fair market rate is determined, we are at impasse.

**George A. Contis**
Giarmarco, Mullins & Horton, P.C.
101 West Big Beaver Road, Suite 1000
Troy, Michigan 48084-5280
Phone: (248) 457-7063
Cell: (248) 890-6256
Fax: (248) 404-6364
Email: gcontis@gmhlaw.com
www.gmhlaw.com



*Confidential: This electronic message and all contents contain information from the law firm of Giarmarco, Mullins & Horton, P.C. which may be privileged, confidential or otherwise protected from disclosure. Any recipient other than the intended recipient is hereby notified that any disclosure, copy, distribution or use of the contents of this message or any attachments is strictly prohibited. If you have received this electronic message in error, please notify us immediately by reply e-mail or by phone and destroy the original message, attachments and all copies.*

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matters addressed in this communication.

**From:** Sara Von Bernthal <sara.vonbernthal@stellantis.com>
**Sent:** Thursday, May 27, 2021 11:18 AM
**To:** George A. Contis <gcontis@gmhlaw.com>
**Cc:** Ed O'Neill <edward.oneill@external.stellantis.com>
**Subject:** Possible Lease Extension; A & W X-Press, Inc. (Ray's Transport) / FCA US LLC / 22077 Mound Road, Warren, MI (the "Premises")

Good morning, Mr. Contis.

I am in-house real estate counsel for FCA US LLC ("FCA").

Thank you for your recent emails to Ed O'Neill concerning the fair market rental rate with respect to the upcoming renewal option under the lease for the referenced Premises (the "Lease").

FCA disagrees with your determination of the fair rental rate for the Premises, and believes that your research is flawed for the following reasons:

- Your comparisons are not for properties in Warren, which is a unique and saturated market, wherein industrial properties are in high demand.
- With the exception of the comparison of the property in Roseville, your comparisons all pertain to triple net leases (which are at a much lower rental rate than the rental rate for a modified gross lease, such as the Lease).
- The rental rate for the Premises is not limited to the building. As you are aware, the Premises consists of a "23,350 square foot industrial facility on 10.68 acres in the City of Warren", as identified on Exhibit "A" to the Lease. As further evidence that the land is a critical component of the Premises, pursuant to Section 12 of the Lease, Tenant is permitted to use the Premises for "office, truck/trailer repair, and parking/storage of trucks/tractors/trailers and food-related items".
- The Class "C" condition of the Premises was taken into account by FCA in determining fair market rental rate.

As you are aware, the Lease does not require the parties to submit to an appraisal process to determine the fair market rental rate for the Premises. Accordingly, FCA stands by its determination of the fair market rent for the Premises (inclusive of the truck, tractor and trailer parking and storage areas) based on the going rate for industrial properties in the relevant market, including the current fair market rental rate for truck and trailer parking and storage.

FCA's in-house broker, Ed O'Neill, will be reaching out to your client soon to further discuss this matter.

Regards,

Sara von Bernthal



**Sara Engle von Bernthal**
Senior Counsel, Real Estate
Office of the General Counsel

STELLANTIS
1000 Chrysler Drive, CIMS 485-14-78
Auburn Hills, MI USA 48326-2766
Office: (248) 512-3890
Cell: (248) 909-7548
sara.vonbernthal@stellantis.com

# EXHIBIT H



## Geoffrey S. Wagner

| | |
|---|---|
| **From:** | George A. Contis |
| **Sent:** | Thursday, June 10, 2021 8:57 AM |
| **To:** | 'Sara Von Bernthal' |
| **Cc:** | 'Ed O'Neill'; 'Ray Mosawi'; 'preschke@spartanreg.com' |
| **Subject:** | RE: Possible Lease Extension; A & W X-Press, Inc. (Ray's Transport) / FCA US LLC / 22077 Mound Road, Warren, MI (the "Premises") |
| **Attachments:** | Buildings Land Warren.xlsx |
| **Importance:** | High |

Ms. Von Bernthal:

I received feedback from my client and his broker, and as indicated in my May 27 email to you, this is a supplement to my response from that date.

In support of what we assert is a fair market rental rate for the property, we provided CoStar lease reports in our original email to Ed O'Neil. In your May 27 email to me you dispute our proposed fair market rental rate for the property yet provide no evidentiary support for your position. Kindly provide us with any third party reports supporting your determination of a fair market rental rate for the property; further:

- As stated in my May 27 email; the lease does not provide the landlord with the unilateral ability to establish the fair market rental rate.
- The rental rate for the property under the original and extended terms was based on a rental rate for the property in its entirety; not on a bifurcated basis for 1) the building and 2) trailer parking.
- The landlord lacks the authority to bifurcate the lease rate for the extended term as there is no authority to do so under the lease.
- The proposed lease rate cannot, in any way, be tied to the overinflated price that Stellantis paid the previous owner for the property, which was purchased knowing that it was subject to an existing lease with an additional 5 year extension option.
- Our client's broker conducted a search for every industrial building in the City of Warren ranging in size from 18 K – 30 K square feet (comparable to the property at issue) with a minimum of 5 acres of land. The attached Excel spreadsheet includes all property in Warren that meet these requirements (some are much larger parcels). As evidenced by the attached, most of the like kind properties are owner occupied, however, there are several on the list which are relevant.

We stand ready to negotiate a market lease rental rate in good faith. Perhaps my suggested appraisal process remains the most viable option. I look forward to the courtesy of a reply at your earliest opportunity.

**George A. Contis**
Giarmarco, Mullins & Horton, P.C.
101 West Big Beaver Road, Suite 1000
Troy, Michigan 48084-5280
Phone: (248) 457-7063
Cell: (248) 890-6256
Fax: (248) 404-6364
Email: gcontis@gmhlaw.com
www.gmhlaw.com

1



*Confidential: This electronic message and all contents contain information from the law firm of Giarmarco, Mullins & Horton, P.C. which may be privileged, confidential or otherwise protected from disclosure. Any recipient other than the intended recipient is hereby notified that any disclosure, copy, distribution or use of the contents of this message or any attachments is strictly prohibited. If you have received this electronic message in error, please notify us immediately by reply e-mail or by phone and destroy the original message, attachments and all copies.*

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matters addressed in this communication.

**From:** George A. Contis
**Sent:** Thursday, May 27, 2021 1:51 PM
**To:** Sara Von Bernthal <sara.vonbernthal@stellantis.com>
**Cc:** Ed O'Neill <edward.oneill@external.stellantis.com>
**Subject:** RE: Possible Lease Extension; A & W X-Press, Inc. (Ray's Transport) / FCA US LLC / 22077 Mound Road, Warren, MI (the "Premises")
**Importance:** High

Ms. von Bernthal:

Thank you for responding to my email to Mr. O'Neill; it was forwarded to my client and his real estate broker for further comment. Once I receive their feedback I will share it with you.

You are correct the lease does not include an appraisal component to determine **fair market rate** for the second Renewal Term. Similarly, the lease does not grant landlord administrative fiat to unilaterally establish fair market rate. Until such time as the parties can reach an agreement on how the fair market rate is determined, we are at impasse.

**George A. Contis**
Giarmarco, Mullins & Horton, P.C.
101 West Big Beaver Road, Suite 1000
Troy, Michigan 48084-5280
Phone: (248) 457-7063
Cell: (248) 890-6256
Fax: (248) 404-6364
Email: gcontis@gmhlaw.com
www.gmhlaw.com



*Confidential: This electronic message and all contents contain information from the law firm of Giarmarco, Mullins & Horton, P.C. which may be privileged, confidential or otherwise protected from disclosure. Any recipient other than the intended recipient is hereby notified that any disclosure, copy, distribution or use of the contents of this message or any attachments is strictly prohibited. If you have received this electronic message in error, please notify us immediately by reply e-mail or by phone and destroy the original message, attachments and all copies.*

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matters addressed in this communication.

**From:** Sara Von Bernthal <sara.vonbernthal@stellantis.com>
**Sent:** Thursday, May 27, 2021 11:18 AM
**To:** George A. Contis <gcontis@gmhlaw.com>
**Cc:** Ed O'Neill <edward.oneill@external.stellantis.com>
**Subject:** Possible Lease Extension; A & W X-Press, Inc. (Ray's Transport) / FCA US LLC / 22077 Mound Road, Warren, MI (the "Premises")

Good morning, Mr. Contis.

I am in-house real estate counsel for FCA US LLC ("FCA").

Thank you for your recent emails to Ed O'Neill concerning the fair market rental rate with respect to the upcoming renewal option under the lease for the referenced Premises (the "Lease").

FCA disagrees with your determination of the fair rental rate for the Premises, and believes that your research is flawed for the following reasons:

- Your comparisons are not for properties in Warren, which is a unique and saturated market, wherein industrial properties are in high demand.
- With the exception of the comparison of the property in Roseville, your comparisons all pertain to triple net leases (which are at a much lower rental rate than the rental rate for a modified gross lease, such as the Lease).
- The rental rate for the Premises is not limited to the building. As you are aware, the Premises consists of a "23,350 square foot industrial facility on 10.68 acres in the City of Warren", as identified on Exhibit "A" to the Lease. As further evidence that the land is a critical component of the Premises, pursuant to Section 12 of the Lease, Tenant is permitted to use the Premises for "office, truck/trailer repair, and parking/storage of trucks/tractors/trailers and food-related items".
- The Class "C" condition of the Premises was taken into account by FCA in determining fair market rental rate.

As you are aware, the Lease does not require the parties to submit to an appraisal process to determine the fair market rental rate for the Premises. Accordingly, FCA stands by its determination of the fair market rent for the Premises (inclusive of the truck, tractor and trailer parking and storage areas) based on the going rate for industrial properties in the relevant market, including the current fair market rental rate for truck and trailer parking and storage.

FCA's in-house broker, Ed O'Neill, will be reaching out to your client soon to further discuss this matter.

Regards,

Sara von Bernthal



**Sara Engle von Bernthal**
Senior Counsel, Real Estate
Office of the General Counsel

STELLANTIS
1000 Chrysler Drive, CIMS 485-14-78
Auburn Hills, MI USA 48326-2766
Office: (248) 512-3890
Cell: (248) 909-7548
sara.vonbernthal@stellantis.com

# EXHIBIT I

## Geoffrey S. Wagner

| | |
|---|---|
| **From:** | Sara Von Bernthal <sara.vonbernthal@stellantis.com> |
| **Sent:** | Monday, June 21, 2021 4:38 PM |
| **To:** | George A. Contis |
| **Subject:** | Re: Possible Lease Extension; A & W X-Press, Inc. (Ray's Transport) / FCA US LLC / 22077 Mound Road, Warren, MI (the "Premises") |

Good afternoon.

I will be sending a proposed appraisal process to determine fair market rent tomorrow.

In the meantime, your client is in default for non-payment of an increase in real estate taxes, which constitutes additional rent under the lease. Accordingly, our outside counsel will be sending a statutory 7-day notice for non-payment of rent to your client (with a copy to you) today.

Thanks.
Sara



**Sara Engle von Bernthal**
Senior Counsel, Real Estate
Office of the General Counsel

STELLANTIS
1000 Chrysler Drive, CIMS 485-14-78
Auburn Hills, MI USA 48326-2766
Office: (248) 512-3890
Cell: (248) 909-7548
sara.vonbernthal@stellantis.Com

On Mon, Jun 21, 2021 at 12:00 PM Sara Von Bernthal <sara.vonbernthal@stellantis.com> wrote:
> Mr. Contis,
>
> I am hoping to be in a position to respond to your email below today or tomorrow.
>
> Thank you for your patience.
>
> Regards,
> Sara von Bernthal
>
> 
>
> **Sara Engle von Bernthal**
> Senior Counsel, Real Estate
> Office of the General Counsel
>
> STELLANTIS

1

1000 Chrysler Drive, CIMS 485-14-78
Auburn Hills, MI USA 48326-2766
Office: (248) 512-3890
Cell: (248) 909-7548
sara.vonbernthal@stellantis.com

On Thu, Jun 10, 2021 at 8:58 AM George A. Contis <gcontis@gmhlaw.com> wrote:

Ms. Von Bernthal:

I received feedback from my client and his broker, and as indicated in my May 27 email to you, this is a supplement to my response from that date.

In support of what we assert is a fair market rental rate for the property, we provided CoStar lease reports in our original email to Ed O'Neil. In your May 27 email to me you dispute our proposed fair market rental rate for the property yet provide no evidentiary support for your position. Kindly provide us with any third party reports supporting your determination of a fair market rental rate for the property; further:

- As stated in my May 27 email; the lease does not provide the landlord with the unilateral ability to establish the fair market rental rate.
- The rental rate for the property under the original and extended terms was based on a rental rate for the property in its entirety; not on a bifurcated basis for 1) the building and 2) trailer parking.
- The landlord lacks the authority to bifurcate the lease rate for the extended term as there is no authority to do so under the lease.
- The proposed lease rate cannot, in any way, be tied to the overinflated price that Stellantis paid the previous owner for the property, which was purchased knowing that it was subject to an existing lease with an additional 5 year extension option.
- Our client's broker conducted a search for every industrial building in the City of Warren ranging in size from 18 K – 30 K square feet (comparable to the property at issue) with a minimum of 5 acres of land. The attached Excel spreadsheet includes all property in Warren that meet these requirements (some are much larger parcels). As evidenced by the attached, most of the like kind properties are owner occupied, however, there are several on the list which are relevant.

We stand ready to negotiate a market lease rental rate in good faith. Perhaps my suggested appraisal process remains the most viable option. I look forward to the courtesy of a reply at your earliest opportunity.

**George A. Contis**
Giarmarco, Mullins & Horton, P.C.
101 West Big Beaver Road, Suite 1000
Troy, Michigan 48084-5280
Phone: (248) 457-7063

Cell: (248) 890-6256
Fax: (248) 404-6364
Email: gcontis@gmhlaw.com
www.gmhlaw.com



*Confidential: This electronic message and all contents contain information from the law firm of Giarmarco, Mullins & Horton, P.C. which may be privileged, confidential or otherwise protected from disclosure. Any recipient other than the intended recipient is hereby notified that any disclosure, copy, distribution or use of the contents of this message or any attachments is strictly prohibited. If you have received this electronic message in error, please notify us immediately by reply e-mail or by phone and destroy the original message, attachments and all copies.*

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matters addressed in this communication.

**From:** George A. Contis
**Sent:** Thursday, May 27, 2021 1:51 PM
**To:** Sara Von Bernthal <sara.vonbernthal@stellantis.com>
**Cc:** Ed O'Neill <edward.oneill@external.stellantis.com>
**Subject:** RE: Possible Lease Extension; A & W X-Press, Inc. (Ray's Transport) / FCA US LLC / 22077 Mound Road, Warren, MI (the "Premises")
**Importance:** High

Ms. von Bernthal:

Thank you for responding to my email to Mr. O'Neill; it was forwarded to my client and his real estate broker for further comment. Once I receive their feedback I will share it with you.

You are correct the lease does not include an appraisal component to determine **fair market rate** for the second Renewal Term. Similarly, the lease does not grant landlord administrative fiat to unilaterally establish fair market rate. Until such time as the parties can reach an agreement on how the fair market rate  is determined, we are at impasse.

**George A. Contis**
Giarmarco, Mullins & Horton, P.C.
101 West Big Beaver Road, Suite 1000
Troy, Michigan  48084-5280
Phone: (248) 457-7063

Cell: (248) 890-6256
Fax: (248) 404-6364
Email: gcontis@gmhlaw.com
www.gmhlaw.com



*Confidential: This electronic message and all contents contain information from the law firm of Giarmarco, Mullins & Horton, P.C. which may be privileged, confidential or otherwise protected from disclosure. Any recipient other than the intended recipient is hereby notified that any disclosure, copy, distribution or use of the contents of this message or any attachments is strictly prohibited. If you have received this electronic message in error, please notify us immediately by reply e-mail or by phone and destroy the original message, attachments and all copies.*

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matters addressed in this communication.

**From:** Sara Von Bernthal <sara.vonbernthal@stellantis.com>
**Sent:** Thursday, May 27, 2021 11:18 AM
**To:** George A. Contis <gcontis@gmhlaw.com>
**Cc:** Ed O'Neill <edward.oneill@external.stellantis.com>
**Subject:** Possible Lease Extension; A & W X-Press, Inc. (Ray's Transport) / FCA US LLC / 22077 Mound Road, Warren, MI (the "Premises")

Good morning, Mr. Contis.

I am in-house real estate counsel for FCA US LLC ("FCA").

Thank you for your recent emails to Ed O'Neill concerning the fair market rental rate with respect to the upcoming renewal option under the lease for the referenced Premises (the "Lease").

FCA disagrees with your determination of the fair rental rate for the Premises, and believes that your research is flawed for the following reasons:

- Your comparisons are not for properties in Warren, which is a unique and saturated market, wherein industrial properties are in high demand.
- With the exception of the comparison of the property in Roseville, your comparisons all pertain to triple net leases (which are at a much lower rental rate than the rental rate for a modified gross lease, such as the Lease).
- The rental rate for the Premises is not limited to the building. As you are aware, the Premises consists of a "23,350 square foot industrial facility on 10.68 acres in the City of Warren", as identified on Exhibit "A" to the Lease. As further evidence that the land is a critical component of the Premises, pursuant to Section 12 of the Lease, Tenant is permitted to use the Premises for "office, truck/trailer repair, and parking/storage of trucks/tractors/trailers and food-related items".
- The Class "C" condition of the Premises was taken into account by FCA in determining fair market rental rate.

As you are aware, the Lease does not require the parties to submit to an appraisal process to determine the fair market rental rate for the Premises. Accordingly, FCA stands by its determination of the fair market rent for the Premises (inclusive of the truck, tractor and trailer parking and storage areas) based on the going rate for industrial

properties in the relevant market, including the current fair market rental rate for truck and trailer parking and storage.

FCA's in-house broker, Ed O'Neill, will be reaching out to your client soon to further discuss this matter.

Regards,

Sara von Bernthal



**Sara Engle von Bernthal**
Senior Counsel, Real Estate
Office of the General Counsel

STELLANTIS
1000 Chrysler Drive, CIMS 485-14-78
Auburn Hills, MI USA 48326-2766
Office: (248) 512-3890
Cell: (248) 909-7548
sara.vonbernthal@stellantis.com

5

# EXHIBIT J



FIAT CHRYSLER AUTOMOBILES

**June 24, 2021**

**VIA EMAIL AND OVERNIGHT DELIVERY**

A&W X-Press, Inc. ("Tenant")
Attn: Ray Mosawi, Principal
22077 Mound Road
Warren, MI 48091

**RE:** **That certain Lease Agreement dated August 31, 2011, as amended by that certain Agreement dated as of September 22, 2011 and as further amended by that certain Agreement dated June\_\_, 2016 (as amended, the "Lease") for that certain real property commonly known as 22077 Mound Road, Warren, Michigan and more particularly described in the Lease (the "Premises")**

Dear Mr. Mosawi:

Our in-house counsel, Sara vonBernthal, has been in contact with your counsel, George Contis, regarding the fair market rental value of the Premises.

In those communications, Mr. Contis stated the following, which we take issue with for the following reasons:

1. The lease does not provide the landlord with the unilateral ability to establish the fair market rental rate.

   Our position is that the Lease is silent on which party determines the fair market rental value (hereinafter the "FMR") and there is no language requiring an independent appraisal process to determine the FMR. The language simply states the renewal rate shall be "at a fair market rate." Because there is no mechanism to resolve the FMR issue, we will be amenable to move to a determination of FMR pursuant to and in accordance with the Appraisal Mechanism, as set forth and defined below.

2. The rental rate for the property under the original and extended terms was based on a rental rate for the property in its entirety; not on a bifurcated basis for 1) the building and 2) trailer parking.

   Our position with respect to this argument is that there are many factors that go into determining FMR for the Premises. It includes the entirety of the Premises (including the Class C condition of the building and the land on which such building is located) and it must include an appropriate land contribution as part of that valuation. The Premises consists of a "23,350 square foot industrial facility on 10.68 acres in the City of Warren," as identified on Exhibit "A" to the Lease. As further evidence that the land is a critical component of the Premises



FIAT CHRYSLER AUTOMOBILES

and thus the valuation, pursuant to Section 12 of the Lease, Tenant is permitted to use the Premises for "office, truck/trailer repair, and parking/storage of trucks/tractors/trailers and food-related items." Parking /Storage of trucks/ tractors/trailers is integral to the FMR of the Premises. We did not bifurcate this analysis but note that, among other customary factors, sufficient weight must be given to (i) market timing and (ii) the appropriate land contribution (and the use of the land for parking/storage of trucks/tractors). Plus, the current use of the Premises is primarily trailer parking/storage so this must be major component in determining the FMR of the Premises.

3. The landlord lacks the authority to bifurcate the lease rate for the extended term as there is no authority to do so under the lease.

See our response above. We did not bifurcate the lease rate.

4. The proposed lease rate cannot, in any way, be tied to the overinflated price that Stellantis paid the previous owner for the property, which was purchased knowing that it was subject to an existing lease with an additional 5 year extension option.

Our position is that the FMR was and will not be tied to the purchase price, but rather to the current FMR as of the time of the option extension.

Notwithstanding our differing positions on the foregoing, we are amenable to follow and abide by the following Appraisal Mechanism to determine the Fair Market Rent for the Premises:

"Appraisal Mechanism:

The process for determining the Fair Market Rent shall be as follows:

(a) Within fifteen (15) days after the countersignature of this letter agreement by Tenant, (1) Tenant shall provide to Landlord any and all documentation, information and/or data regarding any income that was generated from Tenant's lease, sublease, license or any other occpancy agreement with another party of all or a part of the Premises, including the truck, tractor and trailer parking, including without limitation, rental income from the date we purchased the Property, being December 2, 2019, to the current date (for confirmation of Tenant's adherence to the terms of Section 9 of the Lease) and (2) Landlord and Tenant shall each appoint, at each of their own cost and expense, an MAI appraiser with experience in real estate activities, including at least ten (10) years' of current experience in appraising space used for the uses of the Premises permitted by the Lease, including, without limitation, truck, tractor, and trailer parking, consistent with the zoning and land use classification applicable to the Premises in the City of Warren, State of Michigan area, to each provide, as soon as reasonably practicable (but in any event no longer than fifteen (15) days after appointment), an appraisal of the Fair Market Rent.



FIAT CHRYSLER AUTOMOBILES

(b) If the two appraisals are within ten percent (10%) of the numerical average (mean) of both appraisals, then the Fair Market Rent for the Premises shall be the numerical average (mean) of both appraisals.  If each appraisal is not within ten percent (10%) of the numerical average (mean) of both appraisals, then the two appraisers shall mutually select and appoint a similarly qualified third appraiser within fifteen (15) days after the completion of the first two appraisals.

(c)     Within fifteen (15) days after the appointment of the third appraiser, the three appraisers shall submit their appraisals in writing, and the Fair Market Rent shall be conclusively presumed by taking the numerical average (mean) of the two appraisals which are closest together.

(d)     Provided the final appraised Fair Market Rent is less than what we proposed to Tenant initially as the fair market rental, the final appraised Fair Market Rent shall be binding on Tenant and on Landlord, but only if approved by Landlord's senior management, for the option term. Each party shall be liable for the fees of the appraiser it selected, and the fees of the third appraiser shall be shared equally by the parties.

(e)     For the purposes of this determination, "Fair Market Rent" means the then prevailing current fair market rental rate for the Premises (which includes all land and improvements, including without limitation, any parking and storage areas (assuming that the Premises have been maintained and repaired as provided for in this Lease), taking into account premises of similar age, quality (but excluding any improvements and enhancements thereto made by or on behalf of Tenant), and location to the Premises and also taking into account the length of the term, the currrent uses of such premises (including land and all improvements), all rent free periods, tenant allowances, and other incentives then being offered by landlords in the market."

This Letter Agreement and related discussions constitute confidential and privileged settlement communications protected by Rule 408 of the Federal and Michigan Rules of Evidence and are not admissible for any purpose.  This communication does not constitute a waiver, and Tenant and Landlord affirmatively reserve all rights, legal, equitable, and otherwise, each has under contracts and applicable law.

If you are in agreement with the Appraisal Mechansim, please countersign in the space provided below by no later than June 29, 2021.  Please contact Ed O'Neill at 248-821-8142 or edward.oneill@stellantis.com with any questions/comments.

Very truly yours,
FCA US LLC

Gretchen Sonego

By:   _____
        Gretchen Sonego
Its:   Director – Treasury



**FIAT CHRYSLER AUTOMOBILES**

ACCEPTED AND AGREED TO THIS
_____ DAY OF _____, 2021

A&W X-PRESS, INC.

By: _____

Its: _____

cc:    George A. Contis - Giarmarco, Mullins & Horton, P.C. - gcontis@gmhlaw.com
101 West Big Beaver Road, Suite 1000
Troy, Michigan 48084-5280
4816-4182-1167 v5 [22624-363]

# EXHIBIT K



**June 24, 2021**

**VIA EMAIL AND OVERNIGHT DELIVERY**

A&W X-Press, Inc. ("Tenant")
Attn: Ray Mosawi, Principal
22077 Mound Road
Warren, MI 48091

**RE: That certain Lease Agreement dated August 31, 2011, as amended by that certain Agreement dated as of September 22, 2011 and as further amended by that certain Agreement dated June___, 2016 (as amended, the "Lease") for that certain real property commonly known as 22077 Mound Road, Warren, Michigan and more particularly described in the Lease (the "Premises")**

Dear Mr. Mosawi:

Our in-house counsel, Sara vonBernthal, has been in contact with your counsel, George Contis, regarding the fair market rental value of the Premises.

In those communications, Mr. Contis stated the following, which we take issue with for the following reasons:

> 1. The lease does not provide the landlord with the unilateral ability to establish the fair market rental rate.
>
>    Our position is that the Lease is silent on which party determines the fair market rental value (hereinafter the "FMR") and there is no language requiring an independent appraisal process to determine the FMR. The language simply states the renewal rate shall be "at a fair market rate." Because there is no mechanism to resolve the FMR issue, we will be amenable to move to a determination of FMR pursuant to and in accordance with the Appraisal Mechanism, as set forth and defined below. Establishing a mutually agreeable appraisal process has been the Tenant's position from the outset.
>
> 2. The rental rate for the property under the original and extended terms was based on a rental rate for the property in its entirety; not on a bifurcated basis for 1) the building and 2) trailer parking.
>
>    Our position with respect to this argument is that there are many factors that go into determining FMR for the Premises. It includes the entirety of the Premises (including the Class C condition of the building and the land on which such building is located) and it must include an appropriate land contribution as part of that valuation. The Premises consists of a "23,350 square foot industrial facility on 10.68 acres in the City of Warren," as identified on Exhibit "A" to the Lease. As further evidence that the land is a critical component of the Premises



and thus the valuation, pursuant to Section 12 of the Lease, Tenant is permitted to use the Premises for "office, truck/trailer repair, and parking/storage of trucks/tractors/trailers and food-related items." Parking /Storage of trucks/ tractors/trailers is integral to the FMR of the Premises. We did not bifurcate this analysis but note that, among other customary factors, sufficient weight must be given to (i) market timing and (ii) the appropriate land contribution (and the use of the land for parking/storage of trucks/tractors). Plus, the current use of the Premises is primarily trailer parking/storage so this must be major component in determining the FMR of the Premises. The lease speaks for itself and Tenant's use of the Premises has not changed since lease inception.

3. The landlord lacks the authority to bifurcate the lease rate for the extended term as there is no authority to do so under the lease.

   See our response above. We did not bifurcate the lease rate. Tenant respectfully diagrees.

4. The proposed lease rate cannot, in any way, be tied to the overinflated price that Stellantis paid the previous owner for the property, which was purchased knowing that it was subject to an existing lease with an additional 5 year extension option.

   Our position is that the FMR was and will not be tied to the purchase price, but rather to the current FMR as of the time of the option extension. Landlord has failed to provide lease comparables despite tenant's repeated requests.

Notwithstanding our differing positions on the foregoing, we are amenable to follow and abide by the following Appraisal Mechanism to determine the Fair Market Rent for the Premises:

"Appraisal Mechanism:

The process for determining the Fair Market Rent shall be as follows:

(a)     Within fifteen (15) days after the countersignature of this letter agreement by Tenant, (1) Tenant shall provide to Landlord any and all documentation, information and/or data regarding any income that was generated from Tenant's lease, sublease, license  or any other occpancy agreement with another party of all or a part of the Premises, including the truck, tractor and trailer parking, including without limitation, rental income from the date we purchased the Property, being December 2, 2019, to the current date (for confirmation of Tenant's adherence to the terms of Section 9 of the Lease) and (2) Landlord and Tenant shall each appoint, at each of their own cost and expense, an MAI appraiser with experience in real estate activities, including at least ten (10) years' of current experience in appraising space used for the uses of the Premises permitted by the Lease, including, without limitation, truck, tractor, and trailer parking, consistent with the zoning and land use classification applicable to the Premises in the City of Warren, State of Michigan area, to each provide, as soon as reasonably practicable (but in any event no longer than fifteen (15) days after appointment), an appraisal of the Fair Market Rent. Tenant objects to (a)(1) and will not provide the requested information has no bearing on an appraiser's determination of FMR.



(b) If the two appraisals are within ten percent (10%) of the numerical average (mean) of both appraisals, then the Fair Market Rent for the Premises shall be the numerical average (mean) of both appraisals.  If each appraisal is not within ten percent (10%) of the numerical average (mean) of both appraisals, then the two appraisers shall mutually select and appoint a similarly qualified third appraiser within fifteen (15) days after the completion of the first two appraisals. See *b - (below)

(c)     Within fifteen (15) days after the appointment of the third appraiser, the three appraisers shall submit their appraisals in writing, and the Fair Market Rent shall be conclusively presumed by taking the numerical average (mean) of the two appraisals which are closest together. See *c (below)

(d)     Provided the final appraised Fair Market Rent is less than what we proposed to Tenant initially as the fair market rental, the final appraised Fair Market Rent shall be binding on Tenant and on Landlord, but only if approved by Landlord's senior management, for the option term. Each party shall be liable for the fees of the appraiser it selected, and the fees of the third appraiser shall be shared equally by the parties.  See *d (below)

(e)     For the purposes of this determination, "Fair Market Rent" means the then prevailing current fair market rental rate for the Premises (which includes all land and improvements, including without limitation, any parking and storage areas (assuming that the Premises have been maintained and repaired as provided for in this Lease), taking into account premises of similar age, quality (but excluding any improvements and enhancements thereto made by or on behalf of Tenant), and location to the Premises and also taking into account the length of the term, the currrent *(sic)* uses of such premises (including land and all improvements), all rent free periods, tenant allowances, and other incentives then being offered by landlords in the market." See *e (below)

This Letter Agreement and related discussions constitute confidential and privileged settlement communications protected by Rule 408 of the Federal and Michigan Rules of Evidence and are not admissible for any purpose.  This communication does not constitute a waiver, and Tenant and Landlord affirmatively reserve all rights, legal, equitable, and otherwise, each has under contracts and applicable law.

If you are in agreement with the Appraisal Mechansim, please countersign in the space provided below by no later than June 29, 2021.  Please contact Ed O'Neill at 248-821-8142 or edward.oneill@stellantis.com with any questions/comments.

Very truly yours,
FCA US LLC

By: _____
        Gretchen Sonego
Its:    Director – Treasury



FIAT CHRYSLER AUTOMOBILES

ACCEPTED AND AGREED TO THIS
_____ DAY OF _____, 2021

A&W X-PRESS, INC.

By: _____

Its: _____

cc:    George A. Contis - Giarmarco, Mullins & Horton, P.C. - gcontis@gmhlaw.com
       101 West Big Beaver Road, Suite 1000
       Troy, Michigan  48084-5280
       4816-4182-1167 v5 [22624-363]

*b - Tenant would agree with (b) above modified as follows: *The sole responsibility of the third appraiser will be to determine which of the determinations made by the first two appraisers is most accurate. The third appraiser shall have no right to propose a middle ground or any modification of either of the determinations made by the first two appraisers. The third appraiser's choice shall be submitted to the parties within fifteen (15) days after his or her selection. Such determination shall bind both of the parties and shall establish the fair market rental value of the Premises.*

*c - Tenant will not agree to this provision; instead (b) as modified by tenant immediately above shall control.

*d - Tenant will not agree to the requirement that the FMR requires approval by Landlord's senior management - this is akin to Landlord getting the proverbial 2 bites of the apple when tenant receives only 1. The third appraiser's determination of FMR shall control if the first 2 appraisals are more than 10% apart.

*e - Tenant would agree with (e) above is modified as follows: *The fair market value rent shall be the rental rate that comparable landlords in the recognized market area where the Premises are located have accepted in then-current transactions between non-affiliated parties for renewal, non-sublease, creditworthy tenants, leasing space for a reasonably comparable period of time, comparable in size, location and quality to the Premises in buildings reasonably comparable in size, quality and appearance with reasonably comparable vacancy factors ("Comparable Transactions"). In any determination of Comparable Transactions, consideration shall be given to annual rental rates per rentable square foot, the standard of measurement by which the rentable square footage is measured, the ratio of rentable square feet to usable square feet, the type of escalation clauses (including, without limitation, whether increases in additional rent are determined on a net or gross basis, and if gross, whether such increases are determined according to a base year or a base dollar amount expense stop), rental abatement concessions reflecting free rent and/or no rent during the period subsequent to the commencement date as to the space in question, brokerage commissions, if any, which would be payable by landlord in a Comparable Transaction, building standard work letter and/or tenant improvement allowances, and all other monetary and non-monetary concessions, if any, and other generally applicable conditions of tenancy for such Comparable Transactions being granted such tenants in connection with comparable space.*

If you are in agreement with the Appraisal Mechansim as modified by tenant above, please countersign in the space provided below by no later than June 30, 2021. Please contact George A. Contis, Esq. at 248-890-6256 or gcontis@gmhlaw.com with any questions/comments.

FCA US LLC
_____
By: _____
Title: _____

# EXHIBIT L



2600 WEST BIG BEAVER ROAD, SUITE 300
TROY, MI 48084-3312
TELEPHONE: (248) 433-7200
FACSIMILE: (844) 670-6009
http://www.dickinsonwright.com

MONICA J. LABE
MLabe@dickinsonwright.com
(248) 433-7226

July 20, 2021

**VIA EMAIL AND OVERNIGHT DELIVERY**

A&W X-Press, Inc. ("Tenant")
Attn:  Ray Mosawi, Principal
22077 Mound Road
Warren, MI 48091

A&W X-Press, Inc.
Attn:  Lisa Wood
22077 Mound Road
Warren, MI 48091

**RE:**     **That certain Lease Agreement dated August 31, 2011, as amended by that certain First Amendment to Lease Agreement dated as of September 22, 2011 and as further amended by that certain Second Amendment to Lease Agreement dated June __, 2016 (the "Second Amendment")(as amended, the "Lease") for that certain real property commonly known as 22077 Mound Road, Warren, Michigan and more particularly described in the Lease (the "Premises")**

Ladies and Gentlemen:

Tenant has failed to timely provide written notice to FCA US LLC ("Landlord") of Tenant's exercise of the remaining Option to Renew under the terms of Section 39 of the Lease. Accordingly, such Option to Renew is null and void and the Lease shall expire on September 30, 2021.  Tenant is obligated to surrender the Premises to Landlord in accordance with the terms of the Lease by no later than September 30, 2021.

Under Section 9 of the Lease, Tenant is required to pay to Landlord any sums obtained by Tenant from the Premises that are in excess of the amount Tenant is paying under the Lease. Under FCA's letter dated June 24, 2021, FCA requested an accounting to confirm Tenant's adherence to this Lease term, in the form of documentation, information and/or data regarding any income that was generated from Tenant's lease, sublease, license or any other occupancy agreement with another party of all or a part of the Premises, including the truck, tractor and trailer parking, including without limitation, rental income from the date Landlord purchased the Property, being December 2, 2019, to the current date. Tenant refused Landlord's request for this information.

Landlord now makes demand for this accounting. If you refuse to provide this information, Landlord intends to exercise all rights and remedies it has under law and under the Lease.

DICKINSON WRIGHT PLLC

A&W X-Press, Inc. ("Tenant")
Attn: Ray Mosawi, Principal
A&W X-Press, Inc.
Attn: Lisa Wood
July 20, 2021
Page 2

Please contact Ed O'Neill at 248-821-8142 or edward.oneill@stellantis.com with any questions/comments.

Very truly yours,

Monica J. Labe

cc:   George A. Contis - Giarmarco, Mullins & Horton, P.C. - gcontis@gmhlaw.com
101 West Big Beaver Road, Suite 1000
Troy, Michigan 48084-5280
Sara vonBernthal
Edward O'Neill

ARIZONA   CALIFORNIA   ILLINOIS   FLORIDA   KENTUCKY   MICHIGAN
NEVADA   OHIO   TENNESSEE   TEXAS   TORONTO   WASHINGTON DC

# EXHIBIT M

## Geoffrey S. Wagner

| | |
|---|---|
| **From:** | George A. Contis |
| **Sent:** | Tuesday, July 20, 2021 2:00 PM |
| **To:** | Monica J. Labe; Ray@raystransport.com |
| **Cc:** | Sara Engle vonBernthal (sara.vonbernthal@stellantis.com); Ed O'Neill |
| **Subject:** | RE: FCA/ A & W Express, Inc. (Ray's Transport)/ 22077 Mound Road, Warren, MI |

Monica:

Thank you for the letter.  This is laughable as you know that your client has failed to act in good faith.

**George A. Contis**
Giarmarco, Mullins & Horton, P.C.
101 West Big Beaver Road, Suite 1000
Troy, Michigan  48084-5280
Phone: (248) 457-7063
Cell: (248) 890-6256
Fax: (248) 404-6364
Email: gcontis@gmhlaw.com
www.gmhlaw.com



\*Confidential:  This electronic message and all contents contain information from the law firm of Giarmarco, Mullins & Horton, P.C. which may be privileged, confidential or otherwise protected from disclosure.  Any recipient other than the intended recipient is hereby notified that any disclosure, copy, distribution or use of the contents of this message or any attachments is strictly prohibited.  If you have received this electronic message in error, please notify us immediately by reply e-mail or by phone and destroy the original message, attachments and all copies.\*

IRS Circular 230 Disclosure:  To ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matters addressed in this communication.

**From:** Monica J. Labe <MLabe@dickinson-wright.com>
**Sent:** Tuesday, July 20, 2021 1:54 PM
**To:** Ray@raystransport.com; George A. Contis <gcontis@gmhlaw.com>
**Cc:** Sara Engle vonBernthal (sara.vonbernthal@stellantis.com) <sara.vonbernthal@stellantis.com>; Ed O'Neill <edward.oneill@external.stellantis.com>
**Subject:** FCA/ A & W Express, Inc. (Ray's Transport)/ 22077 Mound Road, Warren, MI

Please see the attached letter sent to you on behalf of FCA US LLC. Thank you, Monica

**Monica J. Labe** Member

| | |
|---|---|
| 2600 W. Big Beaver Rd. Suite 300 Troy MI 48084 | Phone 248-433-7226 |
| | Fax     844-670-6009 |
| Profile   V-Card | Email MLabe@dickinsonwright.com |

1

# EXHIBIT N

# GMH GIARMARCO, MULLINS & HORTON, P.C.
## ATTORNEYS AND COUNSELORS AT LAW

Detroit ▼ Troy ▼ Florida

| | | | |
|---|---|---|---|
| Salvatore A. Amodeo | Kellie S. DeVito | Nina M. Jankowski | James Y. Rayis |
| John A. Anderson | Elizabeth A. Favaro | Keela P. Johnson | Annabel F. Shea |
| Peter J. Bill | Kara S. Ferrara | Salvatore J. LaMendola | Lauren M. Studley |
| Michael L. Bosnic | Timothy D. Finegan | Alexander Lebedinski | Paul A. Thursam |
| Robert A. Bryant | John R. Fleming | Victoria S. Lehman | Jared M. Trust |
| Thomas P. Cavanaugh | John J. Giarmarco | Adam Levitsky | Geoffrey S. Wagner |
| Kenneth B. Chaple | Julius H. Giarmarco | John L. Miller | Donald K. Warwick |
| Anthony K. Chubb | Bruce W. Haffey | Karie Miller | Matthew S. Weaver |
| John C. Clark | William H. Heritage, III | Timothy J. Mullins | Richard A. Wojewoda |
| Travis M. Comstock | Stephen J. Hitchcock | Ryan L. Perry | LeRoy H. Wulfmeier, III |
| George A. Contis | William H. Horton | Dennis M. Rauss | |

Of Counsel
Lance T. Denha (Florida)
David G. Gorcyca
Albert Taylor Nelson, Jr
Peter J. Sarkesian
Lawrence F. Schiller

Direct Dial: (248) 457-7063
E-mail: gcontis@gmhlaw.com

July 26, 2021

**VIA EMAIL AND OVERNIGHT DELIVERY**

Monica J. Labe, Esq.
Dickinson Wright PLLC
2600 West Big Beaver Road, Suite 300
Troy, MI 48084

> Re:   Lease Agreement for Premises Located at 22077 Mound Road, Warren, MI as amended (the "Lease") - Response to Your July 20, 2021 Correspondence.
> Our Client:   A&W X-Press, Inc. ("Tenant") ·
> Your Client:   FCA US LLC ("Landlord")

## THIS CORRESPONDENCE CONTAINS CONFIDENTIAL AND PRIVILEGED SETTLEMENT COMMUNICATIONS UNDER RULE 408 OF BOTH THE FEDERAL AND MICHIGAN RULES OF EVIDENCE.

Dear Ms. Labe:

In response to your correspondence dated July 20, 2021, Tenant denies that it has failed to exercise its option to renew the terms of the Lease. Quite to the contrary, as early as mid-late April Tenant was directly engaged in telephonic and electronic discussions with Edward O'Neill regarding the lease renewal and the establishment of a fair market rental rate. Further, following our firm's representation of the Tenant and prior to your involvement in the matter, we had communications with Mr. O'Neill and Landlord's in-house real estate counsel, Sara Engle von Berthal regarding the lease option and the mechanism for the establishment of a fair market rental rate.

Since April, Tenant has acted and negotiated in good faith while Landlord has failed to so act at every turn; it (through Mr. O'Neill) first provides Tenant with extortionary proposed lease renewal rates without any substantiation whatsoever , only to be followed by Ms. Sonego's June 24, 2021 correspondence proposing a modification to the appraisal process suggested by Tenant with the caveat that any final appraisal remains subject to the approval of Landlord's senior management. A senior management approval condition would be unacceptable to nearly every commercial tenant in this country.

·

Monica J. Labe, Esq
July 26, 2021
Page 2

Landlord's June 24, 2021 request for confirmation of Tenant's adherence to Section 9 of the Lease was made in the context of Landlord's suggested Appraisal Mechanism; and it was for that reason alone rejected, as it has no bearing on an appraiser's determination of fair market rent for the Property. Tenant stands ready to provide the requested information and will demonstrate that Tenant is in compliance with its obligations under the Lease.

Tenant continues to negotiate in good faith and renews its no nonsense appraisal proposal to establish fair market rent for the upcoming option term which was included in my May 21, 2021 correspondence to Mr. O'Neill:

*The appropriate course of action would be for each party to obtain an MAI appraisal (with agreed upon parameters for establishing the lease rate) from an appraiser that has at least 5 years of experience in the Warren market. If the 2 appraisals are within 10% of each other, the lease rate would be the average of the 2. If the appraisals are not within 10% the 2 appraisers would pick a third appraiser whose sole duty would be to determine which of the 2 is the most accurate (each party would pay for their own appraiser and split the cost for the third appraiser).*

If the Landlord and Tenant are unable to reach an agreement on the appraisal process by Friday, August 6, 2021, we will have no alternative but to recommend to Tenant that it pursue all available remedies at its disposal against Landlord which include but are not limited to filing a declaratory action in the Macomb County Circuit Court regarding the Lease, Tenant's exercise of its option to extend the term thereof, Landlord's refusal to negotiate in good faith and the original landlord's failure to comply with Tenant's right of first refusal to purchase the Premises in violation of Section 40 of the Lease. Based on the totality of the circumstances I hope you agree that it is in the mutual interest of both Landlord and Tenant to continue to negotiate in good faith on a fair appraisal process to establish a fair market rental rate for the upcoming option term.

Very truly yours,

George A. Contis

GAC/kmk

cc:    Mr. Ray Mosawi

# EXHIBIT O



2600 WEST BIG BEAVER ROAD, SUITE 300
TROY, MI 48084-3312
TELEPHONE: (248) 433-7200
FACSIMILE: (844) 670-6009
http://www.dickinsonwright.com

MONICA J. LABE
MLabe@dickinsonwright.com
(248) 433-7226

August 3, 2021

**Via Email and Overnight Delivery**

George A. Contis, Esq.
Giamarco, Mullins & Horton PC
101 West Big Beaver Road, Suite 1000
Troy, MI 48084-5280
gcontis@gmhlaw.com

RE:    **Contis Letter dated July 26, 2021 respecting That certain Lease Agreement dated August 31, 2011, as amended by that certain First Amendment to Lease Agreement dated as of September 22, 2011 and as further amended by that certain Second Amendment to Lease Agreement dated June __, 2016 (the "Second Amendment")(as amended, the "Lease") for that certain real property commonly known as 22077 Mound Road, Warren, Michigan and more particularly described in the Lease (the "Premises")**

Mr. Contis:

This responds to your letter dated July 26, 2021 which was responding to my letter dated July 20, 2021. My July 20, 2021 letter memorialized the fact that Tenant failed to timely provide written notice to FCA US LLC ("Landlord") of Tenant's exercise of the remaining Option to Renew under the terms of Section 39 of the Lease. Certainly, if you had written evidence of Tenant's providing written notice of exercising the Option to Renew, you would have provided it, and you failed to do so. Accordingly and as noted in my July 20, 2021 letter, such Option to Renew is null and void, the Lease shall expire on September 30, 2021 and Tenant is obligated to surrender the Premises to Landlord in accordance with the terms of the Lease by no later than September 30, 2021.

Landlord restates its request in FCA's letter dated June 24, 2021 and my letter dated July 20, 2021, wherein FCA requested an accounting to confirm Tenant's adherence to the Lease, in the form of documentation, information and/or data regarding any income that was generated from Tenant's lease, sublease, license or any other occupancy agreement with another party of all or a part of the Premises, including the truck, tractor and trailer parking, including without limitation, rental income from the date Landlord purchased the Property, being December 2, 2019, to the current date.

Please let me know when you will be providing the requested information.

DICKINSON WRIGHT PLLC

George A. Contis, Esq.
August 3, 2021
Page 2

       Chris Cobb is taking over for Ed O'Neill on this matter and Chris can be reached at (248) 512-3207 or chris.cobb@external.stellantis.com with any questions/comments.

Very truly yours,

Monica J. Labe

cc:     Sara vonBernthal
        Chris Cobb
        Edward O'Neill

4823-7767-1156 v4 [22624-363]

ARIZONA   CALIFORNIA   FLORIDA   ILLINOIS   KENTUCKY   MICHIGAN   NEVADA   OHIO   TENNESSEE   TEXAS   WASHINGTON DC   TORONTO