UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

A & W X-PRESS, INC.,

       Plaintiff,

       v.

FCA US, LLC,

       Defendant.

_____/

Case No. 21-12209

Hon. George Caram Steeh

ORDER GRANTING DEFENDANT'S RENEWED
MOTION FOR SUMMARY JUDGMENT (ECF NO. 89)
AND MOTION FOR SANCTIONS (ECF NO. 91)

Before the court are Defendant's motions for summary judgment and

sanctions. The court heard oral argument on August 15, 2023, and August

22, 2023, and took the matter under advisement. For the reasons explained

below, Defendant's motions are granted.

BACKGROUND FACTS

This case involves an option to extend a lease agreement offered to

Plaintiff A & W X-Press, Inc. The issues before the court are whether

A & W was entitled to renew under the terms of the lease, whether it

properly exercised its option by providing written notice, and whether FCA

waived written notice or should be estopped from requiring it. Because it is

- 1 -

relevant to A & W's compliance with the lease terms, the court will begin with some background on A & W's corporate history.

A & W is a trucking company that was incorporated in 2004 and owned by Lisa Wood. On June 10, 2011, Wood sold some of A & W's assets to Ray's Transport, Inc., which is owned by Ray Almoosawi, Wood's former partner. Ray's Transport purchased A & W's equipment, computers, and other physical assets, except for A & W's Department of Transportation (DOT) number and trucks/trailers.[1] Wood continued to operate the trucking part of A & W's business from 2011 to 2014.

On August 31, 2011, Wood entered into a lease on behalf of A & W with Dunn & Mavis Inc. The property, comprised of an industrial facility and approximately ten acres of land, is located in Warren, Michigan. The initial term of the lease was five years, expiring in 2016. The lease provided for a renewal option for two five-year terms:

> Provided Tenant has never been in default of the terms and conditions of the Lease, Landlord shall grant Tenant two (2) Options to Renew the Lease Agreement for five (5) year Lease Terms. Should Tenant elect to exercise its Option, Tenant shall provide Landlord with ninety (90) days advance written notice, return receipt requested. The rent schedule for the first five (5) year Renewal Term shall be at

---

[1] This is based upon the testimony of Wood and Almoosawi, although the business sale agreement references the sale of "all" of A & W's assets. ECF No. 98-4.

> a monthly rate of $9,750.00. The rent schedule for the
> second Renewal Term shall be at a fair market rate.

ECF No. 1 at PageID 25.

In 2014, the Federal Motor Carrier Safety Administration ("FMCSA") ordered A & W to cease operations based upon an unsatisfactory safety rating. ECF No. 89-7. In an affidavit provided to the FMCSA, Wood described A & W's financial problems and stated that "in 2013, I had to start surrendering the trailers to the leasing company. . . . The company had no future and was only incurring liabilities at every turn. The company was shut down. I ultimately dissolved the corporation." ECF No. 89-8. In 2014, Wood shut down A & W's remaining trucking operations and sold its trucks and trailers to Ray's Transport and Fadaa Alyasiri, Almoosawi's brother. She filed a certificate of dissolution of the corporation with the Michigan Department of Licensing and Regulatory Affairs on June 20, 2014. *Id.* at PageID 3405.

Despite Wood's representations, Plaintiff asserts that A & W still operates as a trucking company and owns approximately 8-10 trucks and 10 trailers. A & W allegedly provides dispatch services to Ray's Transport and repairs trucks at the Warren property. However, A & W has not presented financial or other records evidencing that it has owned

- 3 -

equipment, employed workers, or conducted business since its dissolution in 2014. Ray's Transport operates its business at the leased Warren property, and according to Plaintiff, A & W operates as part of Ray's Transport.[2] ECF No. 98-2 at PageID 4407-4408.

In 2016, A & W exercised its option to extend the lease for another five years, until September 30, 2021. Although A & W contends that it exercised its option orally in a telephone call, its real estate agent, Paul Reschke, sent a letter by email notifying Dunn & Mavis that A & W intended to exercise its option.[3] ECF No. 89-5; ECF No. 99 at PageID 4593-94. A & W, though Wood, signed an amendment to the lease agreement, indicating that A & W was exercising its option to renew the lease for a five-year term. ECF No. 98-5. The amendment stated that "Section 39 of the Agreement shall further be amended to reflect the fact that Tenant will have one Option to Renew remaining. . . . In all other respects, the terms, covenants and conditions of the Agreement and Amendment by and between Landlord and Tenant shall remain in full force and effect." *Id.*

---

[2] In the complaint, A & W alleges that it "has approximately 85 employees and, at any given time, has 100 to 120 trucks and over 135 trailers on site at the Subject Property." ECF No. 1 at PageID 3. Plaintiff argues that this "is 100% accurate when A & W's operations are considered in conjunction with Ray's Transport, Inc." ECF No. 98 at PageID 4352.

[3] Although A & W points out that the letter was not signed, it does not allege facts calling into question the authenticity of the document.

FCA purchased the Warren property from Dunn & Mavis in December 2019. Before the sale, Damien Mavis wrote to Ed O'Neill at FCA: "I have been speaking with Ray from Rays transport [sic] in conjunction with obtaining the estoppel. He requested that I formally ask FCA for an early execution of his remaining option. Let me know if this is a possibility and I will pass on your answer to him." ECF No. 98-7 at PageID 4552. FCA declined to consider modifying the lease at that time, which was two years prior to its expiration and before it purchased the property. ECF No. 33-1.

In August and November 2019, A & W provided two estoppel certificates to FCA, representing that the "Lease constitutes the entire Agreement between Tenant and Landlord concerning the Premises, and has not been assigned, amended or modified [except for the written amendments]." ECF No. 89-17, 89-18. These certificates were signed by Almoosawi as A & W's CEO. FCA assumed the lease when it purchased the property from Dunn & Mavis.

FCA and A & W began to discuss the option to extend the lease in early 2021. Almoosawi testified that he orally informed O'Neill that he wanted to exercise the option in a phone call. ECF No. 98-2 at PageID 4415-16. On April 21, 2021, O'Neill sent an email to Almoosawi, stating that "as per our conversation a couple of months ago, FCA . . . has done

- 5 -

research to determine fair market value rates" for the lease renewal. ECF

No. 1 at PageID 41-42. O'Neill explained that market rates had

"significantly increased" over the last ten years and proposed a payment of

approximately $72,000 per month. *Id.*

A & W responded through its counsel, George Contis, that FCA's

proposal was "grossly overstated." *Id.* at PageID 44. A & W suggested that

the parties hire appraisers to establish the market rate. *Id.* FCA responded

that the lease did not require an appraisal and that it "stands by its

determination of the fair market rent." *Id.* at PageID 47. Contis answered

that "[u]ntil such time as the parties can reach an agreement on how the

fair market rate is determined, we are at an impasse." *Id.* at PageID 49. On

June 24, 2021, FCA proposed its own appraisal mechanism, and A & W

responded that it would not agree without certain modifications. *Id.* at

PageID 67-70. Ultimately, the parties did not reach an agreement regarding

the market rate or appraisal process.

A & W had until July 2, 2021, to exercise its renewal option. On July

20, 2021, FCA notified A & W that it had not received timely written notice

of A & W's intent to exercise its renewal option as required under the lease.

ECF No. 1 at PageID 72. A & W alleges that FCA failed to act in good faith

and that it had hoped that the rent would be too expensive for A & W to

renew. The lease term expired on September 30, 2021. FCA requested that A & W surrender the premises, but A & W remains on the property, which FCA intends to use as a parking lot for employees of its adjacent Warren Truck Assembly Plant.

A & W brought this action on September 20, 2021, seeking injunctive and declaratory relief, including specific performance of the lease and a declaration that FCA is equitably estopped and/or waived its right to demand strict compliance with the written notice requirement. Essentially, A & W argued that the parties' negotiations regarding the fair market rate demonstrated that it had exercised its option and that FCA should be estopped from arguing otherwise. In an order denying A & W motion for temporary restraining order, the court determined that it failed to demonstrate a strong likelihood of success on the merits. The Sixth Circuit affirmed the denial of injunctive relief. ECF No. 46.

FCA filed a motion for summary judgment on January 27, 2022, which the court denied without prejudice in favor of allowing additional discovery. ECF No. 36. FCA has renewed its motion, arguing that A & W was in breach of the lease and not entitled to exercise its option, and that it failed to strictly comply with the option offer by providing written notice of its intent. A & W argues that it was never in breach of the lease, that it

provided effective notice, and that FCA waived the written notice requirement and/or should be estopped from raising it due to its conduct.

<u>LAW AND ANALYSIS</u>

I. <u>Summary Judgment Standard</u>

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, the court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Dist. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The facts and any reasonable inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In response to a properly supported motion for summary judgment, the opposing party must come forward with specific evidence showing there is a genuine issue of fact for trial. *Anderson*, 477 U.S. at 252.

II.     Contract and Option Legal Principles

The parties agree that Michigan law applies to this dispute. Under

Michigan law, "[t]he primary goal of contract interpretation is to honor the

intent of the parties." *Old Kent Bank v. Sobczak*, 243 Mich. App. 57, 63,

620 N.W.2d 663 (2000). To achieve that goal, the court reads the contract

as a whole. *Id*. If the contractual language is "clear and unambiguous, the

terms are to be taken and understood in their plain, ordinary, and popular

sense." *Michigan Mut. Ins. Co. v. Dowell*, 204 Mich. App. 81, 87, 514

N.W.2d 185 (1994). The interpretation of clear and unambiguous

contractual language is a question of law for the court. *Solo v. United*

*Parcel Serv. Co.*, 819 F.3d 788, 794 (6th Cir. 2016) (citation omitted).

Under Michigan law, an option to lease or purchase land is treated as

an offer:

> An option is not a contract of purchase; it is simply a
> contract by which the owner of the property agrees with
> another that he shall have a right to buy the property at a
> fixed price within a specified time. *An option is but an offer,*
> *strict compliance with the terms of which is required;*
> acceptance must be in compliance with the terms
> proposed by the option both as to the exact thing offered
> and within the time specified; *otherwise the right is lost.*

*Le Baron Homes v. Pontiac Hous. Fund*, 319 Mich. 310, 313, 29 N.W.2d

704, 706 (1947) (emphasis added); *Johnson Fam. Ltd. P'ship v. White Pine*

*Wireless, LLC*, 281 Mich. App. 364, 393, 761 N.W.2d 353, 370 (2008).

Substantial compliance with the terms of an option is insufficient to constitute acceptance. *Le Baron Homes*, 319 Mich. at 316-17 (citation omitted).

A. Condition Precedent to Exercise of Option

FCA argues that A & W was not entitled to exercise its option, because it breached the terms of the lease and thus did not satisfy the condition precedent. "A condition precedent . . . is a fact or event that the parties intend must take place before there is a right to performance. If the condition is not satisfied, there is no cause of action for a failure to perform the contract." *Harbor Park Market, Inc. v. Gronda*, 277 Mich. App. 126, 131; 743 N.W.2d 585 (2007) (quotation marks and citation omitted); *see also Illiria, Inc. v. Pinebrook Plaza, LLC*, 2018 WL 5305103, at *3 (Mich. App. Oct. 25, 2018) (failure to perform the condition precedent of making timely rent payments precluded tenant from exercising option to renew lease).

The lease agreement provides that A & W is eligible to exercise its option "[p]rovided Tenant has never been in default of the terms and conditions of the Lease. . . ." ECF No. 89-3 at § 39. FCA asserts that A & W breached the lease by (1) declaring itself insolvent and dissolving; and (2) subleasing or assigning the lease to Ray's Transport and others. With respect to insolvency, Section 10 of the lease agreement provides:

- 10 -

10. **BANKRUPTCY AND INSOLVENCY:** The Tenant hereby agrees that if the estate created hereby shall be taken in execution, or by other process of law or if the Tenant shall be declared bankrupt or insolvent, according to law, or any receiver appointed for the business and property of the Tenant, or if any assignment shall be made of the Tenant's property for the benefit of creditors, then in such event this lease may be canceled at the option of the Landlord.

ECF No. 89-3 at § 10. Section 9 of the agreement prohibits the assignment of the lease without the landlord's permission:

9. **ASSIGNMENT:** The Tenant covenants not to assign or transfer this Lease, or hypothecate or mortgage the same or sublet said premises or any part thereof without the written consent of the Landlord. Any assignment, transfer, hypothecation, mortgage, or subletting without said written consent shall give the Landlord the right to terminate his lease and to re-enter and repossess the leased premises. Notwithstanding the foregoing, Landlord acknowledges that Tenant may sublease certain areas of the vacant parcel to customers for the purpose of truck, tractor & trailer parking/storage. . . .

*Id.* at § 9.

A & W's representations regarding its corporate status and operations have been conflicting and opaque.[4] It argues that it was never in

---

[4] *Compare* ECF No. 1 at ¶ 12 ("A&W has approx. 85 employees/contractors and, at any given time, has 100 to 120 trucks and over 135 trailers on site at the Subject Property."); ECF No. 5-3 (Almoosawi affidavit affirming numbers in complaint); ECF No. 10 at PageID 326 (stating that Ray's Transport "is simply a sister company . . . that assists A & W with its trucking operations"); *with* ECF No. 98-2 at PageID 4400-4408 (Almoosawi testifying that A & W has two employees, himself and Wood, who do not receive compensation, and 8-10 trucks and about 10 trailers; he considers A & W and Ray's Transport "as the same company" and "part of Ray's Transport operation"); ECF

breach of the lease because it continued to operate as part of Ray's Transport after Wood "let everything go" in 2014. This argument is difficult to square with Wood's representations that the company had more liabilities than assets and that she shut it down in 2014. In addition, A & W has not provided evidence that it continues to operate, such as bank records, tax returns, contracts, or other documentation demonstrating that it has assets or employees, provides services, or collects revenue. A & W's bare assertion that it "operates as part of Ray's Transport" elides corporate formalities and fails to establish a question of fact that it is an insolvent shell corporation. *See generally Seasword v. Hilti, Inc.*, 449 Mich. 542, 547, 537 N.W.2d 221, 224 (1995) ("It is a well-recognized principle that separate corporate entities will be respected . . . . [and] parent and subsidiary corporations are separate and distinct entities.").

Moreover, there is no genuine issue of material fact that Ray's Transport has operated out of the leased premises and paid the rent.[5] The

---

No. 89-14 (Almoosawi affidavit stating that Ray's "now owns the majority of the trucks/trailers that A & W dispatches to various jobs/locations" based upon the 2011 asset sale); ECF No. 89-13 (Almoosawi affidavit stating in 2014 that "A & W X-Press is not now and never has been a business in which I have had any ownership or control" and that he leased office space and truck parking to A & W).

[5] Other entities affiliated with Almoosawi also operate on the property, including Fadaa Alyasiri d/b/a Ray's Transport and Quality Truck & Trailer, Inc., also in apparent violation of the lease. *See* ECF No. 89-13 at PageID 3532, 3556-62, ECF No. 89-16 at PageID 3637, ECF No. 99-6, ECF No. 100-4.

lease was effectively assigned to Ray's Transport without the written

consent of the landlord.[6] Both the assignment of the lease and the

insolvency of A & W constitute breaches of Sections 9 and 10 of the lease,

precluding A & W from satisfying the condition precedent to exercising its

option to renew. The option is available only if A & W "has *never* been in

default of the terms and conditions of the Lease." Accordingly, A & W's

specific performance and declaratory judgment claims fail.

     B. <u>Written Notice Requirement</u>

     Further, assuming that A & W was eligible to exercise the option,

there is no genuine issue of fact that it did not strictly comply with its terms.

At the outset of this litigation, A & W conceded that it did not provide written

notice of its intent to exercise the option. *See* ECF Nos. 1, 5, 13 at PageID

418. Now changing course, A & W argues that it satisfied the written notice

requirement in 2019, when it requested that Dunn & Mavis ask FCA about

an early lease renewal. According to A & W, Dunn & Mavis's email to FCA,

inquiring about the early renewal, constituted "ninety (90) days advance

written notice, return receipt requested." Assuming that an email satisfies

---

[6] A & W asserts that FCA viewed it and Ray's Transport as "interchangeable" because
they are both owned by Almoosawi. These corporate entities are not interchangeable as
a matter of law. Regardless, there is no dispute that the landlord never gave *written*
consent to assign the lease, as required by the agreement.

- 13 -

the writing requirement, the email was not from A & W providing

unequivocal notice to the landlord, who was Dunn & Mavis at the time. *See*

ECF No. 1 at PageID 25 ("*Tenant* shall provide *Landlord* with ninety (90)

days advance written notice, return receipt requested."). Rather, Dunn &

Mavis inquired about the "possibility" of an early renewal for A & W, and

said it would "pass on" FCA's answer. ECF No. 98-7 at PageID 4552.

Indeed, Dunn & Mavis's principal testified that these communications did

not serve to extend the lease in 2019. ECF No. 91-7 at PageID 4105.

Moreover, A & W did not believe that it actually exercised its option,

because it later represented in its estoppel certificates that the lease had

not been amended or modified, and that it had one option remaining. ECF

No. 89-17, 89-18. There is no genuine issue of material fact that A & W did

not provide written notice to the landlord of its intent to exercise its option in

2019. A & W did not strictly comply with the terms of the option; and, as

noted above, substantial compliance is insufficient under Michigan law to

constitute acceptance. *Le Baron Homes*, 319 Mich. at 316-17.

    C. <u>Waiver of Written Notice Requirement</u>

    A & W next argues that Dunn & Mavis accepted oral notice of its

intent to renew its first option in 2016, and that acceptance served to waive

or modify the lease's written notice requirement in the future. A "party

alleging waiver or modification must establish a mutual intention of the parties to waive or modify the original contract." *Quality Prod. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 372, 666 N.W.2d 251, 258 (2003). "The mutuality requirement is satisfied where a modification is established through *clear and convincing evidence* of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to waive the terms of the original contract." *Id.* at 373 (emphasis added).

As a factual matter, A & W's waiver argument ignores that its agent, Paul Reschke, submitted a *written* notice of A & W's intent to exercise its option in 2016. ECF No. 89-5, ECF No. 99-2 at PageID 4588; ECF No. 91-7 at PageID 4106. Even if Dunn & Mavis accepted oral notice instead of written notice in 2016, such conduct did not serve to modify the lease, which provides that "one or more waivers of any covenant or condition by the Landlord shall not be construed as a waiver of a further breach of the same covenant or condition." ECF No. 89-3, § 31. In addition, in executing the lease extension, the parties stated that "[i]n all other respects, the terms, covenants and conditions of the Agreement and Amendment by and between Landlord and Tenant," including the written notice requirement, "shall remain in full force and effect." *Id.* at PageID 3362. And in 2019, A & W disclaimed any side agreements and represented that the lease

"has not been assigned, amended or modified in any way" and that the lease "constitutes the entire agreement between the Tenant and Landlord concerning the Premises." ECF Nos. 88-17, 88-18. Based upon the plain terms of the lease and its written amendments, the written notice requirement was not waived by Dunn & Mavis and remained in effect when FCA purchased the property and assumed the lease. A & W falls short of demonstrating clear and convincing evidence of a mutual intent to modify the agreement. *See Radiance Aluminum Fence, Inc. v. Marquis Metal Material, Inc.*, 461 F. Supp. 3d 531, 543 (E.D. Mich. 2020) (only evidence of an oral contract modification was a party's "deposition testimony, which falls far short of anything that is clear and convincing").

A & W also contends that it provided oral notice of its intent to exercise its option in early 2021 in a phone call between Almoosawi and O'Neill.[7] The parties then engaged in lengthy negotiations regarding the fair market rate for the rent. A & W argues that these negotiations indicate that FCA waived the written notice requirement. A & W does not allege that FCA expressly accepted oral notice, but that such acceptance should be inferred by the fact that FCA engaged in negotiations regarding the fair

---

[7] In its complaint and TRO motion, A & W did not allege that it ever provided oral notice to FCA. *See* ECF No. 13 at PageID 421.

market rate. The court rejected these arguments when it denied A & W's

motion for injunctive relief, and the Sixth Circuit affirmed, finding A & W's

"cyclical logic" to be "unconvincing."

> That A&W and FCA made efforts to agree on a fair market
> rate for the rent does not mean A&W had already agreed
> to renew the lease. Upon review of the communications
> between the parties, at no point does FCA recognize or
> accept that A&W has exercised its option to renew the
> lease. And, as the district court acknowledged,
> negotiations of fair market rate "does not unequivocally
> express A&W's desire to renew the lease" because "it
> would have been reasonable for the parties to agree on the
> rent *before* A&W bound itself to a five-year lease
> extension."

*A & W X-Press, Inc. v. FCA US, LLC*, 2022 WL 2759872, at *4 (6th Cir.

July 14, 2022).

A & W does not explain why the result should be different at this

stage of the proceedings. In order to waive its right to written notice, FCA

would have to do so "intentionally and knowingly." *South Macomb Disposal

Auth. v. Michigan Mun. Risk Mgmt. Auth.*, 207 Mich. App. 475, 476, 526

N.W.2d 3 (1994). "[C]onduct that does not express any intent to relinquish

a known right is not a waiver, and a waiver cannot be inferred by mere

silence." *Moore v. First Security Cas. Co.*, 224 Mich. App. 370, 376, 568

N.W.2d 841 (1997). At most, FCA was silent regarding the oral notice

A & W allegedly provided; A & W does not point to statements by FCA

indicating that it considered oral notice acceptable. The court finds that there is no genuine issue of material fact regarding whether FCA waived the written notice requirement.

### D. Estoppel

Similar to its waiver argument, A & W contends that FCA should be estopped from enforcing the written notice provision based upon its conduct in negotiating the fair market rate. Again, the court rejected this argument at the preliminary injunction stage, and the Sixth Circuit affirmed. *A & W X-Press*, 2022 WL 2759872 at *5. A & W does not articulate a basis for a different result here. It continues to rely upon *Pleger v. Bouwman*, 61 Mich. App. 558, 561, 233 N.W.2d 82, 84 (1975) and similar cases that the Sixth Circuit found to be "distinguishable." 2022 WL 2759872 at *5.

In *Pleger*, the plaintiffs orally informed the defendants of their intent to exercise their option. The defendants arranged to close the deal and set a closing date, but failed to appear at the closing. The defendants later claimed that the plaintiffs failed to exercise the option in writing as required by the contract. The court determined that the defendants were estopped from requiring written notice:

> Plaintiffs were led to believe that they had effectively and
> validly communicated to defendants their intention to
> exercise the option. In reliance thereon they obtained the
> necessary funds and prepared to close the deal. Had they

> been aware that written notice was going to be insisted
> upon, they surely would have supplied it. Defendants
> cannot be allowed to cajole plaintiffs into believing that
> verbal notification was sufficient and then wait silently until
> the option's expiration date to assert technical deficiencies
> in the plaintiffs' performance.

*Pleger*, 61 Mich. App. at 561.

Here, A & W has not shown that FCA induced it to believe that it need

not provide written notice of its intent to exercise its option. Assuming, as

A & W now alleges, that it provided oral notice, there is no evidence that

FCA proceeded as if oral notice was sufficient and written notice was

unnecessary. For example, FCA did not draft a lease amendment or take

other concrete steps like the defendants in *Pleger*, who made

arrangements to close the deal. At most, FCA engaged in negotiations

regarding the market rate; ultimately, the parties neither agreed on an

amount nor on an appraisal process. In the emails between the parties,

FCA does not acknowledge or assume that A & W has exercised its option

to renew the lease, nor does FCA take steps to consummate the

transaction. A & W does not point to conduct on the part of FCA that

reasonably induced it to believe that written notice of the lease renewal was

not necessary. *See Gershenson v. United Cap. Corp.*, 2003 WL 24132690,

at *6 (E.D. Mich. July 3, 2003) (Battani, J.), *aff'd*, 122 Fed. Appx. 263 (6th

Cir. 2005) (no grounds for equitable relief under *Pleger* when defendant did

- 19 -

not, through misconduct or culpable negligence, induce the plaintiff to believe that compliance with the terms of the option was not necessary).

Aside from the merits, A & W is not entitled to equitable relief because it has come before the court with unclean hands. "The unclean-hands doctrine is 'a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the [opposing party].' Any willful act that transgresses equitable standards of conduct is sufficient to allow a court to deny a party equitable relief." *New Prod. Corp. v. Harbor Shores BHBT Land Dev., LLC*, 331 Mich. App. 614, 627, 953 N.W.2d 476, 484 (2019). Despite its representations to the contrary, the evidence (or lack thereof) demonstrates that A & W is not an operational company that uses the property to conduct business. It attempts to evade this conclusion by arguing that it is part of Ray's Transport, or that the companies are "interchangeable." But this is not what A & W stated at the outset of this litigation, when asked by the court which entity would be harmed if the lease were not renewed: "A&W *owns everything* in . . . [the] 24,000-square-foot facility, all of the equipment, all of the machinery, and the majority of the trucks and trailers. *So this argument that it's Ray's that will be harmed, which is simply a wholly owned*

- 20 -

*subsidiary that contracts with A&W* to also make deliveries is, frankly, nonsense." ECF No. 12 at PageID 366-67 (emphasis added). *See also* ECF No. 10 at PageID 326 ("Ray's Transport, Inc. . . . is simply a sister company – i.e., which, like A&W, is owned exclusively by Ray Almoosawi – that assists A&W with its trucking operations. Finally, the overwhelming majority of the trucks/property/etc. located at the Subject Property are, in fact, owned and utilized by A&W."). *See also infra,* Section II.A. & n.4.

A & W attempts to rehabilitate its prior misrepresentations by suggesting that they are "100% accurate when A&W's operations are considered *in conjunction with those of Ray's Transport, Inc.,*" which is the opposite of what it asserted at the TRO hearing and only serves to underscore its inaccuracy. ECF No. 98 at PageID 4352 (emphasis added). It also provides a lengthy overview of how the trucking industry works (*Id.* at PageID 4346-50); for example, explaining that "trucking companies will often refer to their 'employees,' 'trucks,' or 'trailers' when under general business, corporate, and employment laws and regulations, those 'employees' are actually independent contractors, and the 'trucks' and 'trailers' are not technically owned by the trucking company at all." ECF No. 98 at PageID 4347. This superfluous explanation has no bearing on this case because there is no evidence that A & W does business, either with

independent contractors, "in conjunction with" Ray's Transport, or otherwise.

Having evidenced a lack of candor regarding its corporate existence and business operations, A & W is not entitled to seek equitable relief from the court under the doctrine of unclean hands.

E. Conclusion

In sum, there is no genuine issue of material fact that (1) A & W was not eligible to exercise its option to renew the lease because it had previously breached terms related to insolvency and assignment; (2) A & W did not provide written notice of exercising its option; (3) neither Dunn & Mavis nor FCA waived the written notice requirement; (4) FCA did not induce A & W into believing that it had exercised its option or that written notice was unnecessary, through negotiating fair market rent or otherwise; and (5) alternatively, the doctrine of unclean hands precludes A & W's request for equitable relief. Therefore, A & W cannot sustain its claims for specific performance or declaratory judgment and FCA is entitled to judgment as a matter of law.

III.    Sanctions

FCA seeks sanctions pursuant to Rule 56(h) or the court's inherent authority, arguing that A & W submitted affidavits that contained false

information and omitted critical facts. The court possesses the inherent authority to sanction a party or attorney who litigates "in bad faith, vexatiously, wantonly, or for oppressive reasons." *First Bank of Marietta v. Hartford Underwriters Ins.*, 307 F.3d 501, 512 (6th Cir. 2002). "The exercise of inherent authority is particularly appropriate for impermissible conduct that adversely impacts the entire litigation." *First Bank*, 307 F.3d at 516. *See also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991) (the court's inherent authority provides "the ability to fashion an appropriate sanction for conduct which abuses the judicial process"). Bad faith conduct is defined as that which is intentional or reckless, including "lying to the court." *Farrar v. Lapan*, 2023 WL 3151093, at *1 (6th Cir. Apr. 28, 2023); *see also Plastech Holding Corp. v. WM Greentech Auto. Corp.*, 257 F. Supp.3d 867, 872 (E.D. Mich. 2017) ("A party may act in bad faith, for example, if it files a frivolous suit with an improper motive, or if it commits a fraud on the court."). In addition to parties and attorneys, the court has the inherent authority to sanction non-parties who "(1) have a substantial interest in the outcome of the litigation and (2) substantially participate in the proceedings in which [they] interfered." *Helmac Prod. Corp. v. Roth (Plastics) Corp.*, 150 F.R.D. 563, 568 (E.D. Mich. 1993).

As discussed above, A & W has not been forthright about its corporate existence and operations from the outset of this litigation. *See* ECF No. 1 at ¶¶ 12, 13; ECF No. 5-3. Through its representative, Ray Almoosawi, it has provided shifting representations about its business operations, none of which are accurate or supported by evidence. *See* Section II.A. & n.4, Section II.D., *supra.* Because A & W is the signatory to the lease, its operations and existence are central to critical issues in this case, including whether it would be harmed by surrendering the property and whether it was in default of the lease and ineligible to renew. By misrepresenting A & W as an operating business, A & W has prolonged this litigation and Almoosawi has benefited from the delay by remaining on the property to operate his other businesses, which are not parties to the lease. The court finds that A & W and Almoosawi, as its sole representative, have acted in bad faith and that their conduct has adversely impacted the entire litigation. The prejudice to FCA, which has incurred the expense of ferreting out the truth, is clear.

Under similar circumstances, when a party has fabricated evidence, the court has dismissed the action as a sanction. *Farrar v. Lapan*, 2022 WL 4122043, at *4 (E.D. Mich. Sept. 9, 2022), *aff'd*, 2023 WL 3151093 (6th Cir. Apr. 28, 2023). But because FCA has not requested such a sanction and

because A & W was not on notice of this possibility, the court will consider

alternatives. Moreover, at this stage of the proceedings, when the court has

determined that summary judgment should be granted on the merits,

dismissal alone would be inadequate to remedy the prejudice to FCA and

provide specific and general deterrence. "Sanctions for 'violations of the

judicial process' serve not only to 'remedy prejudice to a party' and

'reprimand the offender,' but also to 'deter future parties from trampling

upon the integrity of the court.'" *Plastech*, 257 F. Supp.3d at 878 (citation

omitted).

The court may award attorney's fees, keeping in mind that "such a

sanction, when imposed pursuant to civil procedures, must be

compensatory rather than punitive in nature." *Goodyear Tire & Rubber Co.*

*v. Haeger*, 581 U.S. 101, 108 (2017). The court considers "whether a given

legal fee . . . would nor would not have been incurred in the absence of the

sanctioned conduct." *Id.* at 110. In doing so, courts "need not, and indeed

should not, become green-eyeshade accountants," but may "do rough

justice" without the need to "achieve auditing perfection." *Id.* (citation

omitted). "Accordingly, a district court 'may take into account [its] overall

sense of a suit, and may use estimates in calculating and allocating an

attorney's time." *Id.* (citation omitted).

Given that A & W's misrepresentations have permeated the entire litigation, an argument could be made that FCA is entitled to be compensated for all the fees it has incurred. At a minimum, had A & W disclosed the true operating entity on the property or that it was insolvent from the beginning, FCA could have had a summary judgment ruling in its favor in early 2022, when it filed its first motion. After A & W convinced the court to defer its ruling, FCA was required to engage in extensive discovery and motion practice in preparation for filing a renewed motion for summary judgment over a year later.

Rather than seek all of its fees, FCA has sought to fashion a conservative request based upon the preparation of its renewed motion for summary judgment and taking the deposition of Damien Mavis. In total, FCA seeks $50,797.75 in fees and costs, including court reporter fees and travel expenses related to Mavis's deposition. This reflects 175.6 hours of attorney work at $240 per hour for associates and $380 per hour for partners. The court finds, and A & W does not contest, that the rates and hours expended are reasonable based upon the prevailing market rates, complexity of the case, and experience level of counsel. Further, the amount requested is a fraction of that arguably incurred due to A & W and Almoosawi's misconduct. Pursuant to its inherent authority, the court will

- 26 -

impose a sanction against A & W and Almoosawi, jointly and severally, in the amount of $50,797.75.

ORDER

IT IS HEREBY ORDERED that FCA's motions for summary judgment (ECF No. 89) and sanctions (ECF No. 91) are GRANTED, consistent with this opinion and order.

Dated: September 19, 2023         s/George Caram Steeh
                                  Hon. George Caram Steeh
                                  United States District Judge

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on September 19, 2023, by electronic and/or ordinary mail.

s/Michael Lang
Deputy Clerk

---